**DYNAMICS CORPORATION OF AMERICA, as Successor in Interest to International Fermont, Inc.**

v.

**The UNITED STATES.**

**No. 366-64.**

United States Court of Claims.

Jan. 19, 1968.

Alan Y. Cole, Washington, D. C., attorney of record, for plaintiff. Isaac N. Groner, Jerry D. Anker, Stephen E. Moss, and Cole & Groner, Washington, D. C., of counsel.

Thomas J. Lydon, Washington, D. C., with whom was Acting Asst. Atty. Gen. Carl Eardley, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

COLLINS, Judge.

This matter is before the Court of Claims on cross-motions for summary judgment. There are no disputed issues of fact. For reasons hereafter given, plaintiff's motion is granted, and defendant's cross-motion is denied.

This is a suit based upon a fixed-price, indefinite-quantity contract (No. AF 04(606)–7880), between the defendant, acting through the Department of the Air Force, and plaintiff.[1] Under said contract, plaintiff was to supply diesel generator sets, both skid and wheel mounted, known as the MB-Teen series (MB–15 through MB–19), which vary in capacity from 15 to 150 kilowatts. Defendant agreed to order certain minimum quantities specified in the contract schedule, and plaintiff agreed to furnish, when ordered by defendant, additional quantities of each item up to the maximum quantities specified in the schedule.[2]

1. The contract was originally awarded to International Fermont Machinery, Inc., later named International Fermont, Inc., and thereafter merged into Dynamics Corporation of America, a corporation organized and existing under the laws of the State of New York.

2. Part VIII of the Special Provisions of the contract provides:
"(a) The Contractor agrees to furnish to the Government, when ordered, the supplies or services set forth in the Schedule up to and including the quantity designated in the Schedule as the 'maximum quantity'. The Government agrees to order the quantity of such supplies and services designated in the Schedule as the 'minimum quantity'. Such supplies or services will be furnished at the prices set forth in the Schedule.

"(b) Orders for supplies or services shall be issued by the Contracting Officer in writing, dated, and serially numbered. They shall set forth (i) the supplies or services being ordered, (ii) the quantities to be furnished, (iii) delivery or performance dates, (iv) place of delivery or performance, and (v) packing and shipping instructions, if any. Amendments to orders may be issued in the same manner as original orders. * * *
"The minimum dollar amount to be expended under this contract is
$___*___(excluding spares and spares data.) $2,615,500.00
"The maximum dollar amount to be expended under this contract is
$___*___(excluding spares and spares data.) $11,003,000.00
" * To be completed at time of award."

The schedule also set forth the prices at which the items were to be furnished.

The basic dispute before the court is whether certain orders were "issued" within the time period specified in the contract.

Part XIII of the contract, the provision in question, provided:

CONTRACT PERIOD: Any resulting contract *shall be effective and binding as of the date of approval thereof* * * * and shall remain in effect * * * until all items ordered have been accepted by and delivered to the Government. The Government reserves the right to issue orders against this contract for a period *not to exceed eighteen (18) months* from date of approval of the Contract. [Emphasis supplied.]

The contract was subject to the written approval of the Secretary of the Air Force and expressly stated that it would not be binding until so approved. Plaintiff and defendant are in full agreement that the contract was duly approved on March 11, 1961, and thus, under the terms of the contract, became effective on that date.

The contract provided that Order No. 1 for the minimum quantities would be issued at the time of the award of the contract. Order No. 1 was mailed to plaintiff with the contract on March 11, 1961, the date the contract became effective. Nine more orders were placed from time to time. These orders were termed "calls."

Call No. 1 ordered quantities substantially in excess of the minimum contract quantities. Plaintiff admits that Call Nos. 2 through 7 were issued within the contractual time limitation. However, plaintiff contends that the calls in the following table were issued after termination of defendant's contract right to place additional orders:

| Date of Order | Description | Amount | Date mailed | Date received |
| --- | --- | --- | --- | --- |
| 9/10/62 | Call 10 .................... | $ 11,119.64 | 9/10/62 | After 9/11/62 |
| 9/11/62 | Call 8 .................... | 1,120,891.17 | 9/11/62 | " " |
| 9/11/62 | Call 9 .................... | 89,544.18 | 9/11/62 | " " |
| 9/11/62 | Modification 1 to Call 8 .... | (314,699.00) | 9/17/62 | After 9/17/62 |
| 9/11/62 | Modification 1 to Call 10 .... | 314,699.00 | 9/17/62 | " " |

Since defendant insisted plaintiff supply such orders, plaintiff contends it is entitled to recover the difference between the reasonable value of the additional sets and the amount paid by defendant.

On September 17, 1962, defendant mailed Modification 1 to Call No. 8, dated September 11, 1962, which was received by plaintiff after September 17, 1962. The items deleted by Modification 1 to Call No. 8 were identical to the items added by Modification 1 to Call No. 10. Defendant states that the only effect of this transfer was that the items would be delivered, invoiced, and paid for under Call No. 10 instead of under Call No. 8.

Plaintiff gives two reasons for its contention that Call Nos. 8 through 10 were not timely ordered by defendant within the period specified in the contract: (1) The 18-month period during which orders under the contract could be issued commenced on March 11, 1961, the effective date of the contract, and thus expired on September 10, 1962; (2) an order was not "issued" under the contract until it was received by the contractor, and thus, since Order Nos. 8 through 10 were received after September 11, 1962, they were untimely even if the 18-month period is computed in the manner suggested by defendant. If the plaintiff is correct

on either contention, it is entitled to recover.

In reference to the above contentions, defendant argues that the orders were timely because (1) the first day of the contract should be excluded so that the 18-month period commenced on March 12, 1961, and expired on September 11, 1962; (2) the mailing of such orders by defendant on September 10, 1962 (Call No. 10), and September 11, 1962 (Call Nos. 8 and 9), was issuance under the contract, and the date of receipt is irrelevant.[3]

However, plaintiff's position, as described above, was not always so well defined. Round 1 of the dispute was signaled by plaintiff's letter of September 25, 1962, in which plaintiff's contract administrator advised defendant's contracting officer that the issuance of Call Nos. 8 and 9 had been exercised beyond the 18-month contract period. No mention was made of Call No. 10. Plaintiff expressed its willingness "to negotiate this additional quantity if you [defendant] so desire." On September 28th, the Government replied by letter that Call Nos. 8 and 9 "were issued 11 September 1962, which is within the time period set forth" in the contract.

This led to another letter by plaintiff's contract administrator, dated October 1st. After citing the provision of the contract which gave the Government the right to issue orders for a period of 18 months from the date of approval of the contract, the letter (1) made the erroneous observation that the date of approval of the contract was March *10,* 1961, and (2) concluded from this that the contract period terminated on September 10, 1962, and therefore Call Nos. 8 and 9 were not exercised within the contract period. Plaintiff did not dispute the assertion in defendant's September 28th letter that Call Nos. 8 and 9 were "issued" on September 11, 1962. On October 4, 1962, plaintiff's contract administrator sent a

letter returning Call Nos. 8 and 9, "which have been issued after the expiration of the contract period * * *." Both returned calls had been mailed by defendant on September 11, 1962. However, plaintiff did not return Call No. 10, which had been mailed September 10th and received by it after September 11, 1962.

The Government responded by a letter dated October 9, 1962, in which it pointed out that the contract actually became effective March 11, 1961, contrary to plaintiff's erroneous assumption that it had become effective March 10th. "Therefore," the letter continued, "since Calls #8 and #9 were issued 11 September 1962, they were issued within the time period defined in subject contract for this issuance."

On October 23, 1962, plaintiff's contract administrator responded in a letter in which he explained the source of his erroneous assumption that the contract became effective March 10th. He acknowledged that plaintiff's "calculations of the time period allowable for the issuance of Call orders were based upon the date of 10 March 1961."

Judging from plaintiff's mistaken assumption that the contract was effective March 10th and from the correspondence presented thus far, it is reasonable to assume that plaintiff had not yet taken the position that issuance was accomplished by receipt or that the effective date of the contract was to be included in computing the 18-month period. Rather, plaintiff's initial position seems to have been that, since the effective date of the contract was March 10, 1961, then all calls were untimely if mailed after midnight September 10, 1962 (a computation presumably arrived at by excluding the erroneous March 10th effective date and computing from March 11, 1961, to September 10, 1962).

However, once plaintiff became aware that March 11th was the effective date, it changed its method of computing the

---

3. The parties also argue about the effect of the above-mentioned modifications to Call Nos. 8 and 10, but this question becomes moot by the conclusions reached herein on other issues.

18-month period, and by letter dated January 21, 1963, plaintiff's vice president advised the Government that it remained firm in its position "that Calls #8 and #9 and Modification #1 to Call #10 were not exercised within the time period specified in the subject contract." The letter further stated, that, even on the basis of a March 11th effective date, "the contract period of 18 months from date of approval (11 March 1961) is midnight the 10th of September 1962. All calls exercised beyond 12:00 midnight the 10th of September 1962 are therefore not within the contract period." On January 28, 1963, defendant's contracting officer, by telegram, reaffirmed his position that Call Nos. 8 and 9 were issued within the contract time period and directed plaintiff to produce the generator sets involved. This direction was confirmed by the contracting officer's letter to plaintiff, dated February 5, 1963. The contracting officer also noted in that letter that "Because of the Government's urgent need for these generator sets, we would appreciate a current production report on these two calls." Plaintiff, in its reply of February 8, 1963, reasserted the position stated in its January 21st letter and further stated that, since the Government had directed it to honor the disputed calls, it would do so, but would process a claim under the "disputes" clause of the contract.

On March 8, 1963, the contracting officer issued a formal decision disallowing plaintiff's claim, holding that the 18-month period for issuing calls did not expire until midnight September 11, 1962, and therefore Call Nos. 8 and 9 were properly executed.

On April 10, 1963, plaintiff filed a pro se appeal with the Armed Services Board of Contract Appeals (hereinafter "Board"), contending that Call Nos. 8 and 9 and Modification 1 to Call No. 10 were issued beyond the authorized time limit. The following sentences in plaintiff's appeal indicate that, at that point, plaintiff had not yet taken the position that receipt constituted "issuance" under the contract:

### SUMMARY

\* \* \* \* \* \*

6) Call No. 8 was issued on 11 September 1962, one day after the termination of the 18 months allowed by Part XIII. \* \* \*

7) Call No. 9 was issued on 11 September 1962 (Exhibit 6)

8) Call No. 10 was issued on 10 September 1962 (Exhibit 7)

Plaintiff then retained counsel who decided to raise the issue that timeliness of the calls must be determined on the basis of their date of receipt. Although the parties agreed that a formal amendment of the appeal letter would not be necessary, plaintiff did take the position before the Board that Call Nos. 8, 9, and 10 were untimely because they had been received by plaintiff after September 11, 1962.

The reason the above correspondence has been so laboriously outlined is that the Board relied heavily upon it in its June 10, 1963, decision denying plaintiff's appeal. In concluding that Call Nos. 8, 9, and 10 were issued within the contract period, the Board held that the 18-month period was to be determined by excluding the day the contract was approved, following the general rule of excluding the day from which the time is to begin to run and including the last day of the time period specified.

With respect to the question of the effective date of the exercise of the calls, the Board held that the disputed calls were effective on the date of mailing, not on the date of receipt. The Board said the wording of the contract itself did not demand either conclusion, but it based its holding on the correspondence outlined above and, in particular, upon plaintiff's failure to challenge Call No. 10. The Board concluded that this correspondence showed it was the intent of both parties that, within the meaning of the contract, the date of mailing should be the date of "issue."

Plaintiff filed its petition in this court on October 28, 1964, alleging in substance that Call Nos. 8, 9, and 10 were not timely under the contract and that, therefore, as to such items, plaintiff should recover its costs and a reasonable profit thereon, which plaintiff states amounts to an additional $781,946.14, plus $70,000 deducted by the defendant as a price discount of $1,000 each for 70 production units. Plaintiff's theory is that the untimely calls made by defendant constituted a breach of the contract or a contract implied in fact.

Both parties moved for summary judgment, and the matter was referred, pursuant to Rule 54(b), to one of the court's trial commissioners. The trial commissioner recommended that plaintiff's motion be denied and defendant's motion be granted, holding that (1) the 18-month period commenced March 12, 1961 (the day after the approval of the contract), and terminated September 11, 1962, and (2) the calls were effective on the date of mailing. He based his conclusion primarily on what he interpreted as the intent of the parties, as evidenced by the correspondence described above. We find both the Board and our commissioner in error. For reasons to be explained herein, we find that receipt—not mailing—constitutes issuance, and therefore Call Nos. 8, 9, and 10 were not issued within the 18-month limitation specified in the contract.

To begin with, we must answer defendant's contention that the Board's decision turns on factual issues and, therefore, is entitled to finality. The defendant reasons as follows: (1) Since the contract provisions in question did not contain any specific language to indicate when an order is deemed to have been issued, it became necessary to consider the acts of the parties under the contract in order to ascertain the meaning intended; (2) after considering such acts, the Board found the parties intended that the Government should have the right to issue orders under the contract by mailing such orders at any time up to and including September 11, 1962; (3) the

question of the intent of the parties is a question of fact.

This argument is nothing but semantic sophistry and does not warrant much discussion. Under the express language of both this contract and the Wunderlich Act, 41 U.S.C. §§ 321–322, the Board is entitled to finality only as to questions of fact. That act specifically provides, 41 U.S.C. § 322, that "No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board." This statutory mandate is incorporated into this contract via the standard disputes clause which, by its terms, extends only to "any dispute concerning a question of fact arising under this contract," and which further provides "That nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law."

■ It has been consistently held by this court that the interpretation of the language of a contract is a question of law, not a question of fact, and thus prior administrative determination on such a question is not final or binding on the court. Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 974, 169 Ct.Cl. 384, 386 (1965), and cases cited; Copco Steel & Eng'r Co. v. United States, 341 F.2d 590, 595, 169 Ct.Cl. 601, 610 (1965), and cases cited.

■ The questions before the Board were how the 18-month period specified in the contract was to be computed and whether mailing or receipt constituted "issuance" under the contract. The Board cannot convert these clearly legal issues of contract interpretation into factual issues simply by resolving them in terms of the intent of the parties. For it is always true that "in the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intention of the parties." 4 Williston, Contracts § 601 (3d ed. 1961), quoted with approval in North Am. Philips Co. v. United States, 358 F.2d 980, 982, 175 Ct.Cl. 71, 75 (1966), and Chase & Rice,

Inc. v. United States, 354 F.2d 318, 321, 173 Ct.Cl. 740, 745–746 (1965).

■ The intent of the parties is the ultimate legal conclusion, not a factual matter. If the Board could make binding decisions on matters of contract interpretation merely by speaking in terms of the intent of the parties, the Wunderlich Act would be robbed of much of its purpose. Accordingly, this court is not bound by the Board's decision, but is free to decide this case in accordance with its own view of the law.

The Government next contends that, even if the Board's findings were not binding, both the Board and our trial commissioner were on sound ground in relying upon the conduct of the parties as an indication of their intent. Again we disagree.

The conduct relied upon was the correspondence of the parties (as outlined above) and the position taken by plaintiff in the initial appeal letter it filed with the Board. For the sake of argument, it can be assumed that this correspondence reveals that once it was obvious that a dispute had arisen, plaintiff originally took a position consistent with defendant's contention that mailing constituted issuance of an order. Not until plaintiff filed its brief with the Board did it assert that calls were effectively exercised only when received by plaintiff. (See p. 428, supra.)

■ However, the significant point here is that the correspondence referred to was written after the dispute arose. It is well settled that the practical interpretation of a contract, as shown by the conduct of the parties, is of great weight in interpreting the contract. General Warehouse Two, Inc. v. United States, 389 F.2d 1016, 181 Ct.Cl. —— (Oct. 1967) and cases cited; Universal Match Corp. v. United States, 161 Ct.Cl. 418, 422 (1963), and cases cited. However, this rule only applies to conduct *"during performance,"* [4] and *" ' * * * prior to*

*the time when the contract becomes subject to controversy,'* * * *. [Emphasis supplied.] Union Paving Co. v. United States, 115 F.Supp. 179, 185, 126 Ct. Cl. 478, 489 (1953)."* [5] Only the action of the parties *"before a controversy arises is* highly relevant in determining what the parties intended." [Emphasis supplied.] Northbridge Electronics, Inc. v. United States, 175 Ct.Cl. 426, 438 n. 8 (1966).

■ In the instant case, plaintiff's very first letter was written on September 25, 1962, approximately 2 weeks after the contractual period for making calls under the contract had expired. It was readily apparent at this time that a dispute had arisen—defendant was contending that certain calls were timely issued under the contract, and plaintiff was contending that they were not. Therefore, as the circuit court said in the case of El Paso Natural Gas Co. v. Kelly, 308 F.2d 820, 822 (10th Cir. 1962), "[T]he rule that courts will generally apply an interpretation given by the parties to a doubtful contract * * * is not applicable here as the letters were written during negotiations to settle the dispute * * *."

Lacking relevant conduct prior to the time the dispute arose, the court must therefore be guided by the usual legal effect which the disputed contract provisions would bear in light of applicable judicial precedents and legal principles. For unless the conduct of the parties, or the contract read as a whole, manifests a contrary intent, we should assume the parties intended that normal legal authority and precedents would control.

In analyzing this contract, it cannot be seriously disputed that the portion in question is most accurately characterized as an option contract. As related above, Part VIII ("Orders") of the Special Provisions provides:

* * * The Contractor agrees to furnish to the Government, when ordered, the supplies or services set forth

---

4. Franklin Co. v. United States, 381 F.2d 416, 419, 180 Ct.Cl. ——, (July 1967).

5. Blanchard v. United States, 347 F.2d 268, 273, 171 Ct.Cl. 559, 566, (1965).

in the Schedule up to and including the quantity designated in the Schedule as the "maximum quantity". * * *

Williston describes an option as " 'the obligation by which one binds himself to sell and leaves it discretionary with the other party to buy * * *'." 1 Williston, Contracts § 61A at 199 (3d ed. 1957), citing Black v. Maddox, 104 Ga. 157, 30 S.E. 723 (1898). In the instant case, plaintiff bound itself to sell the additional units should defendant, at its discretion, order them within the contract period.

Corbin, in a lengthier description, states that the primary element of the option contract "is that the option Holder has the legal power to consummate a second contract for the contemplated exchange of equivalents and at the same time the legal privilege of not exercising it. The option giver, on the other hand, has the correlative liability to become bound to execute that exchange, and at the same time a disability to avoid it." 1A Corbin, Contracts § 259 at 464 (1963 ed.). This description also clearly encompasses the instant contract. Similarly, McBride & Wachtel, a recognized authority in the field of Government contracts, refers to this type of contract as an "indefinite quantities option contract" and as an "option contract." [6]

The following comment at page 7 of the decision of the Armed Services Board of Contract Appeals demonstrates that the Board also characterized the contract as an option contract:

* * * [T]he Government had an option (but not an obligation) to issue orders during the 18-month period from date of approval of the contract. * * * [W]e conclude that the Government was obligated to order the minimum quantities on 11 March 1961

and that thereafter * * * it had a right, at its option, to issue additional orders.

The Government employs the identical language on page 42 of its brief, so it appears to agree with this characterization of the contract. The definition of options in the Armed Services Procurement Regulations sheds further light on the Government's view in this area (ASPR 1–1502, 32 C.F.R. § 1.1502 (1967)):

1.1502 Definition.

As used in this subpart, an option clause is a provision in a contract under which, for a specified time, the Government may elect to purchase additional quantities of the supplies and services called for by the contract, or may elect to extend the period of performance of the contract.

This definition also obviously covers the disputed contract.

■ Turning now to the general rule governing exercise of an option, it is well settled that notice to exercise an option is effective only upon receipt. For example, Corbin, after distinguishing the rule governing acceptance of offers, comments as follows on the exercise of options:

* * * [W]hen, by the terms of an already consummated contract it is provided that one party shall have power to produce certain legal results by giving notice, it is usually held that this means notice received in fact and not merely notice mailed. * * * In a contract to ship goods as ordered, there is no duty of immediate performance until an order is received. * *

If in an option contract the duty of the promisor is conditional on "notice within 30 days", does this mean notice

---

6. 2 McBride & Wachtel, Government Contracts § 21.10 (1966 ed.) :

"§ 21.10 Option or Call Type

"An indefinite quantities option contract provides that the contractor shall furnish an indefinite amount of specific supplies or services within a fixed period of time, with deliveries to be made after receipt of an order or call by the

Government. In most instances the Government is required to order a stated minimum of supplies or services, and is permitted to order additional quantities up to a stated maximum * * *.

* * * * *

"The type of contract discussed in this section has also been referred to as an 'option contract,' * * *."

received or notice properly mailed? It is believed that, in the absence of an expression of contrary intention, it should be held that the notice must be received. * * * The rule that an acceptance by post is operative on mailing was itself subjected to severe criticism; and, even though it may now be regarded as settled, it should not be extended to notice of acceptance in already binding option contracts. * * * [1A Corbin, Contracts § 264 at 521 (1963 ed.).]

The courts are in general agreement with this rule. "It is at least the majority rule that notice to exercise an option is effective only upon its receipt by the party to be notified unless the parties otherwise agreed." Cities Serv. Oil Co. v. National Shawmut Bank, 342 Mass. 108, 172 N.E.2d 104, 105 n. 1 (1961). See also Scott-Burr Stores Corp. v. Wilcox, 194 F.2d 989 (5th Cir. 1952) (option to renew a lease held not timely exercised because received after 12-month notice period though mailed within such period), and cases collected at 1A Corbin, Contracts, § 264 at 521–22 n. 50 (1963 ed.).

Finally, a reading of the Armed Services Procurement Regulations, ASPR 1–1505, 32 C.F.R. § 1.1505 (1967), indicates that the Government itself recognizes the validity of the general rule.

1.1505 Exercise of options.

(a) The exercise of an option by the Government requires the contracting officer's written notification to the contractor within the time period specified in the contract.

■ It is agreed that Call Nos. 8, 9, and 10 were all received by the contractor after midnight September 11, 1962. Applying the general rule to the instant case, we therefore hold that all three disputed calls were exercised after the expiration of the 18-month period, no matter which computation is accepted. For even by the Government's computation (ex-

cluding the first day (March 11, 1961) and including the last day), September 11, 1962, is the last day of the period. Accordingly, this disposition of the case makes it unnecessary to decide the issues pertaining to the computation of the contract period.

■ Defendant's final contention is that, even if the contract period had expired when Call Nos. 8, 9, and 10 were issued, plaintiff is still not entitled to recover. Defendant's theory is essentially as follows: Since plaintiff did not have to perform, i. e., supply the items covered by the calls, it should have refused to do so. It is not proper, says defendant, for plaintiff to recover additional amounts which it deliberately elected to incur. When plaintiff elected to deliver the items and accepted the contract price, it waived any right to obtain more than the contract price. As authority for this line of reasoning, defendant cites, *inter alia,* Early & Daniel Co. v. United States, 271 U.S. 140, 46 S.Ct. 457, 70 L.Ed. 874 (1926), and Willard, Sutherland & Co. v. United States, 56 Ct.Cl. 413 (1921), aff'd, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923), cases in which the plaintiffs delivered goods to the Government while protesting that they were not bound to do so under the applicable contracts.

The problem with defendant's argument is that it overlooks the clear mandate of the disputes clause, which reads as follows:

Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

It is the absence of such a clause which distinguishes the earlier cases cited by defendant from the instant case.

This clause protects an important interest of the Government by permitting it to continue to receive needed supplies on schedule,[7] despite disputes which

7. It is interesting to note that, in the instant case, for example, the Government, by its February 5, 1963, letter,

informed plaintiff of the "Government's urgent need for these generator sets * * *."

might arise during performance. It would defeat the salutary purpose of such clauses if contractors who believe that the Government's instructions are beyond the terms of their contracts must refuse to perform in order to preserve their right to obtain more than the contract price.

Furthermore, defendant's contentions truly would place plaintiff on the horns of a dilemma because, even if plaintiff chose to refuse performance in order to preserve its extracontractual rights, it would be doing so at the risk of incurring needless damages for breach of contract should it guess wrong and the Government's order ultimately be held to fall within the contract terms. Plaintiff should not be subjected to this risk. It did all that could reasonably be expected of it under the circumstances by making timely protest and by indicating its intention to file a claim in accordance with the disputes clause of the contract.[8] This served to put the Government on notice that, if it were ultimately held to have demanded goods not required under the contract, it might be required to pay the reasonable value thereof.

In short, the disputes clause in the instant case compelled plaintiff to comply with defendant's directions, and plaintiff's delivery of goods under protest did not act to deprive plaintiff of its right to recover beyond the terms of the contract.

In summary, we hold that Call Nos. 8, 9, and 10 were not received by plaintiff within the 18-month period specified in the contract and were thus not issued within that period. Defendant is thus liable to plaintiff for the reasonable value of the items provided by plaintiff in the fulfillment of said calls. Accordingly, plaintiff's motion for summary judgment is granted, and defendant's cross-motion is denied.

There is no discussion in the briefs directed to the question of damages, including the issue relating to price discounts, and therefore judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).

SKELTON, Judge (dissenting):

I respectfully dissent from the opinion of the majority. I think that the defendant's motion for summary judgment should be granted, because (1) the 18-month period of the contract during which the government could issue orders (calls) under the contract began March 12, 1961 (the day after the contract was approved), and terminated September 11, 1962; (2) the orders (calls) 8, 9, and 10 in controversy here were all issued by the government during such 18-month period; (3) the calls were effective on the days, respectively, they were issued and mailed by the government to the plaintiff; and (4) when the calls were issued and mailed by the government to the plaintiff, the contract, by its express terms, remained in effect "until all items ordered have been accepted by and delivered to the Government."

The two basic questions in dispute between the parties are: (1) when did the 18-month period begin and end during which defendant could issue calls for items under the contract?; and (2) was a call "issued" under the terms of the contract when prepared in writing, dated, serially numbered, and mailed to the

---

8. Plaintiff's letter of February 8, 1963, provides, in part, as follows:

"As stated previously we do not concur that Call Orders 8 and 9 and Change Order One to Call #10 were issued within the contract period.

" * * * However, as you have directed us to honor the obligations imposed by Calls 8 and 9 and Change 1 to Call #10 we are proceeding with the manufacture of the generator set in accordance with the quantities required. In view of the foregoing our delivery schedule may be affected.

"As a result of the decision rendered by the Contracting Officer by letter of 5 February 1963, we have taken steps to process our claim as provided for under the terms of the dispute clause as contained in Contract AF 04(606)–7880. Our claim will be submitted within thirty (30) days in the manner specified under the terms and conditions of subject contract."

plaintiff by defendant's contracting officer within the 18-month period or did the call have to be received by plaintiff during such period before it could be considered as "issued" under the terms of the contract?

As to the first question, I am of the opinion that the 18-month period should be computed in accordance with the general rule that the first day of a contract or a limitation period is excluded, but the last day is counted in determining the period in question. Cf. Stringer v. United States, 90 F.Supp. 375, 378, 117 Ct.Cl. 30, 48 (1950), and cases cited. See Ct.Cl. R. 9. Applying this rule, the first day of the contract (March 11, 1961) is excluded, and, therefore, the 18-month period began on March 12, 1961, and the last day (September 11, 1962) is counted, so that the period ended on September 11, 1962. Call 10 was prepared and mailed September 10, 1962, and Calls 8 and 9 were prepared and mailed September 11, 1962. Thus, we see that all of the calls involved here were prepared and mailed by the contracting officer to the plaintiff during the 18-month period set forth in the contract. This leads us to the second question.

The defendant says that the acts of the contracting officer in preparing and mailing the calls to the plaintiff within the 18-month period provided in the contract constituted issuance of the calls within the meaning of the contract. The plaintiff initially agreed with the defendant on this point, but after engaging counsel and after filing its appeal with the Armed Services Board of Contract Appeals (called the Board), and not until then, changed its position and contended, and now contends, that the calls were not "issued" until plaintiff actually "received" them. It says further that the calls were not received until after the expiration of the 18-month period and, therefore, were ineffective. The trial commissioner concluded that the calls were effective on the dates they were mailed, basing his conclusion on the intent of the parties as shown by their acts and conduct. I think the Commissioner was correct, not only because of the interpretation of the contract in this regard by the action of the parties, but also because of the provisions of the contract itself.

The contract provided:

(a) The Contractor agrees to furnish to the Government, when ordered, the supplies or services set forth in the Schedule * * * at the prices set forth in the Schedule.

(b) Orders for supplies or services *shall be issued* by the Contracting Officer in writing, dated, and serially numbered. * * * [Emphasis supplied.]

The contract further provided:

*CONTRACT PERIOD:* Any resulting contract * * * *shall remain in effect* * * * *until all items ordered have been accepted by and delivered to the Government.* The Government reserves the right *to issue orders* against this contract for a period not to exceed eighteen (18) months from date of approval of the contract. [Emphasis supplied.]

In my opinion, the above-quoted provisions of the contract gave the government the right to issue orders under the contract during the 18-month period, and described in detail how the orders should be issued. Nothing more was required of the government. There was no provision which stated or in any way indicated by inference or otherwise that the orders had to be received by the plaintiff during such period before they would be considered as having been issued. The majority is reading into the contract provisions which do not exist by holding that the orders had to be received by the plaintiff during said period before they were "issued." According to the contract, all the government had to do was to issue the orders within the 18-month period and (by inference) mail them to the plaintiff. (The evidence shows that all orders were mailed the same day they were issued.) When this was done, the contract, by its express terms, provides that it "shall remain in effect * * *

until all items ordered have been accepted by and delivered to the Government." This provision clearly and expressly extended the period of the contract until the plaintiff delivered the items ordered and they were accepted by the government. Consequently, when the plaintiff received the orders such receipt was while the contract was in full force and effect. So, we have a situation where the orders were issued during the 18-month period and were received by the plaintiff while the contract was in force. The plaintiff was obligated to fill the orders in accordance with, and for the prices stated in the contract.

I cannot agree with the majority that this contract is an option contract which requires the plaintiff to *receive* the government's orders within the 18-month period before they could be considered as having been issued. The authorities cited by the majority are inapposite because they provide "in the absence of an expression of contrary intention" or "unless the parties otherwise agreed," the *receipt* of the order is required to make a binding agreement or order. Here we have such an "expression of contrary intention" and a situation where the parties have "otherwise agreed."

In this case the fact that the parties have "otherwise agreed" and that there is "an expression of contrary intention" is shown not only by the express terms of the contract, but also by the conduct of the parties themselves. All of the correspondence between the parties between September 11, 1962, the last day of the 18-month period, and April 10, 1963, the date on which the plaintiff filed a *pro se* appeal with the Board, shows without question that both parties interpreted the contract as providing that so long as the government prepared and mailed the orders within the 18-month period, such orders were issued timely under the contract. No thought or importance was given by either of them as to when plaintiff received the orders. The very first letter from plaintiff, dated September 25, 1962, complained only of the fact that

call Nos. 8 and 9 had been prepared and mailed after the 18-month period had expired according to plaintiff's calculation of the period. The plaintiff at that time thought the contract had been approved March 10, 1961, instead of March 11, 1961. No mention was made of the date the calls were received by plaintiff. Also, no mention was made of call 10, as plaintiff obviously assumed that since it was prepared and mailed on September 10, 1962, which plaintiff erroneously assumed was the last day of the 18-month period, it was timely issued. No complaint was registered that it had not been received prior to the end of said period. A second letter from plaintiff stated that the 18-month period terminated September 10, 1962, and therefore, calls 8 and 9 were not timely issued because they were prepared and mailed September 11, 1962. No mention was made of call 10. In this letter, plaintiff did not dispute defendant's statement in a letter of September 28, 1962, that calls 8 and 9 were issued on September 11, 1962. On October 4, 1962, plaintiff returned calls 8 and 9 to defendant saying both of them had been issued after the expiration of the contract period (that is, on September 11, 1962). Plaintiff did not return call 10, nor dispute its validity, although it was issued September 10 and received by plaintiff after September 11, 1962.

The defendant, by letter of October 9, 1962, informed plaintiff that the contract was not approved March 10, 1961, but became effective on March 11, 1961, and that calls 8 and 9 were issued September 11, 1962, "within the time period defined in subject contract for this issuance." Call 10 was not mentioned.

Plaintiff answered defendant's letter on October 23, 1962, admitting its error in assuming the contract was approved March 10, 1961, and saying its "calculations of the time period allowable for the issuance of call orders were based upon the date of 10 March 1961." By this letter plaintiff again demonstrated its interpretation of the contract and of the intention of the parties as being that as long as the orders were prepared and

mailed during the 18-month period, they were timely issued. No thought was given to when they were received by plaintiff.

When plaintiff learned that the contract became effective on March 11, 1961, instead of on March 10, 1961, it changed its method of computing the 18-month period from that of excluding the first day and counting the last to a system of counting the first day and excluding the last. By this change in position, it was still able to contend that the last day of the 18-month period was September 10, 1962, which was the same date it had arrived at by its first method of calculation. Accordingly, on January 21, 1963, it wrote defendant that even if the contract became effective March 11, 1961, the 18-month period expired September 10, 1962, saying "all calls exercised beyond 12:00 midnight the 10th of September 1962, are, therefore, not within the contract period." Here again plaintiff's only concern was when the orders were prepared and mailed and not when they were received. Other correspondence between the parties reaffirmed their contentions. But the only controversy between them was whether orders 8 and 9 were prepared and mailed within the 18-month period. No mention was made as to when plaintiff received the orders. There was no dispute or controversy over call 10, as it was considered by both parties as having been issued within said period as required by the contract, because it was prepared and mailed on September 10, 1962, which was within the period as calculated by both parties, although plaintiff received it after September 11, 1962.

Further evidence of plaintiff's interpretation of the contract and of the intention of the parties is shown by the fact that on April 10, 1963, plaintiff filed a *pro se* appeal to the Board claiming that calls 8 and 9 were issued after the time limit had expired, but making no mention of when they were received by plaintiff. Also, no mention was made of call 10. All of this shows that plaintiff believed that if any call (as call 10) was prepared and mailed within the speci-fied period, it was "issued" as required by the contract. Of course, this was the position of defendant from the beginning.

Once the appeal was filed with the Board, plaintiff obtained counsel and, thereafter, it completely reversed its interpretation of the meaning of the contract by contending that the calls must not only have been prepared and mailed within the time limit, but also must have been *received* by plaintiff before such period expired in order to have been timely issued. This was such a radical departure from the position previously taken by plaintiff that consideration was given by the parties as to whether an amendment containing plaintiff's new position would have to be filed by plaintiff to its petition before the Board. By agreement of the parties, this was not required.

It is clear that this change of position by plaintiff was an afterthought on its part after it had appealed to the Board. This claim was asserted for the first time seven months after the 18-month period had expired, during which time plaintiff had repeatedly shown its interpretation of the contract and intention of the parties as requiring only that the orders be prepared and mailed within the specified time period.

The majority brushes aside the interpretation of the contract as shown by the conduct of the parties by saying that it cannot be considered because their conduct as evidenced by their correspondence occurred after a dispute or controversy arose between them. This reasoning misses the mark, because during all of this correspondence and while plaintiff was filing its appeal with the Board, there was never any dispute or controversy between the parties except that of whether or not calls 8 and 9 were prepared and mailed before the end of the 18-month period. There was no argument or dispute whatsoever during this period that involved in any way the receipt by plaintiff of the calls during such period as being determinative of their validity. In fact, neither party ever mentioned the receipt of the calls by

plaintiff as having anything to do with their validity. The parties simply never even thought of such a theory.

Regardless of what may be said as to the existence or not of a controversy between the parties as to calls 8 and 9, one fact is indisputable, and that is that no dispute existed between them as to call 10. During all of the correspondence between the parties, call 10 was recognized by both parties as being timely issued under the contract because it was prepared and mailed September 10, 1962, within the specified time period, although it was received by plaintiff after September 11, 1962. This is positive proof of the uninfluenced interpretation of the meaning of the contract by the parties extending over a long period of time before litigation was instituted. Call 10 was neither in dispute nor was it a subject of negotiation for settlement in the correspondence of the parties. It was regarded by both parties as a valid call that was timely issued. We are not justified in disregarding this clear and convincing evidence of the interpretation of the contract by the parties. As was stated by the majority, the interpretation of a contract as shown by the conduct of the parties is of great weight in interpreting the contract. A.R.F. Products, Inc. v. United States, 388 F.2d 692, Ct.Cl., decided December 15, 1967.

In my opinion, calls 8, 9, and 10 were "issued" under the terms of the contract when they were prepared in writing, dated, serially numbered and mailed by defendant to plaintiff within the 18-month period specified in the contract, and the fact that plaintiff received the calls after such period did not affect their validity.

Accordingly, I would adopt the recommendation of the commissioner by denying plaintiff's motion for summary judgment and granting defendant's cross-motion and dismissing plaintiff's petition.

NICHOLS, Judge (dissenting):

I join in Judge Skelton's dissent. I would like to add, I think this and all other courts should approach statutory and contractual provisions, purporting to cut off persons' legal rights or remedies for failure to take merely formal steps, in cases of insubstantial untimeliness, on the basis that the interpretation least favorable to such cut off should be the one most acceptable. I would not conjure up an ambiguity when none really existed, but when so strong a case can be made against the cut off as Judge Skelton makes here, I would not blind myself to the existence of ambiguity. Where amguity existed, I would see clear light as to how it should be resolved. Cf. Charlson Realty Co. v. United States, 384 F.2d 434, 181 Ct.Cl. —— (1967).