**FEDERAL ELECTRIC CORPORATION**

v.

**The UNITED STATES.**

**No. 166–72.**

United States Court of Claims.
Oct. 25, 1973.

---

C. Stanley Dees, Washington, D. C., for plaintiff. Gilbert A. Cuneo, Washington, D. C., attorney of record for plaintiff. Harvey G. Sherzer, Washington, D. C., N. J. Villarosa, Nutley, N. J., and Frank X. Prevost, New York City, of counsel.

Sheldon J. Wolfe, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge.

Plaintiff Federal Electric Corporation (FEC) presents a five-count claim for relief in this case involving an indefinite quantity contract between FEC and the Government:

*Count I* requests a Wunderlich Act (41 U.S.C. §§ 321, 322 (1970)) review of an adverse decision by the Armed Services Board of Contract Appeals (the Board).[1]

*Count II* asserts the Government breached the contract by insisting plaintiff perform following plaintiff's purported revocation.

*Count III* asserts the Government breached the contract by improperly reprocuring under the contract for another supplier's account.

*Count IV* alleges a fifth amendment taking of property as a result of the Government's action described in count II.

*Count V* alleges a fifth amendment taking of property as a result of the Government's action described in count III.

Plaintiff moves for summary judgment on counts I through III, while the Government cross-moves for summary judgment on these three counts and moves for summary judgment on counts IV and V.

We hold that the Board's conclusion in favor of the Government withstands

---

1. Federal Electric Corporation, 68–1 BCA ¶ 6834.

Wunderlich review (count I). We further hold that plaintiff's arguments gain no greater credence by casting the dispute in terms of a breach of an implied-in-fact contract (counts II and III). Thus, our legal conclusions in favor of the Government under Wunderlich review equally dispose of plaintiff's breach claims. Accordingly, the Government's motion for summary judgment on counts I, II and III should be granted, and the plaintiff's motion should be denied.

Having so concluded, it is unnecessary for the court to discuss plaintiff's fifth amendment argument (counts IV and V). Only if the contract had been held unenforceable or the reprocurement erroneous would plaintiff possibly have had an argument that its performance under such conditions resulted in a taking without just compensation. Accordingly, the Government's motion for summary judgment on counts IV and V should be granted.

## I

### Background

FEC responded to an Air Force Request for Proposal (RFP) for the production and delivery of five types of mobile generator sets of varying sizes and capacities. The RFP called for an indefinite quantity contract with a minimum of 453 and a maximum of 3600 generators to be ordered within a 12-month period.[2] On December 17, 1965, the contract (AF 04(606)–15369) was approved by an authorized representative of the Secretary of the Air Force. Thereafter, on December 20, 1965, the Air Force mailed an official acceptance of plaintiff's proposal and at the same time issued the first delivery order for the minimum quantity. On January 11, 1966, the Air Force issued a second delivery order for an additional six generators.

Subsequent to receipt of the first two orders, plaintiff realized that it had made some substantial errors in its response to the RFP which were resulting in unanticipated losses. Plaintiff had anticipated a small loss on the contract, but not to the extent that became apparent once production began. After meeting with the appropriate Air Force officials, plaintiff notified the Government by letter dated March 29, 1966 that it considered the contract unenforceable with respect to all future unordered goods. The contractor further asserted that its offer to supply the Government up to 3600 generators constituted a revocable offer by plaintiff for those units not yet ordered by the Government. In accordance with this position the contractor advised the Government as follows:

1. Federal Electric Corporation hereby withdraws its offer to supply the unordered generators under Contract AF 04(606)–15369 at the prices quoted in the contract.

2. Notwithstanding the above, should the Government deem that the offer of Federal Electric Corporation, as contained in Contract AF 04(606)–15369, is irrevocable and, as a result thereof determines to place additional orders for generators, then Federal Electric Corporation will promptly proceed to manufacture the unit so ordered under protest and without prejudice to its rights.

3. Should, as a result of subsequent actions by FEC and/or the Government, it be determined that FEC's position is correct, as defined above, an equitable adjustment shall be made in accordance with the "Changes" and/or "Extras" clauses of the aforementioned contract.

4. Production under future orders for additional generators will not be

---

2. Part XI of the contract reads:

"This contract shall be effective and binding as of the date of approval thereof by the Secretary or his duly authorized representative as set forth in General Provision 37. The Government reserves the right to issue orders against this contract for a period not to ex-

ceed 12 months from the date of approval. For the purposes of computing the aforementioned 12 month time period on this contract, the first day of the contract period shall be excluded and the last day of the contract shall be included."

deemed as a waiver of FEC's rights to recover the losses it experiences in supplying the generators because of mistakes made by FEC in bidding contract AF 04(606)–15369.

5. FEC further asserts that its actions herein are taken solely for the purpose of protecting FEC's legal rights and that nothing herein should be deemed in any manner whatsoever as a refusal to perform pending resolution of the dispute or disputes between the parties hereto or in any way serve as grounds for terminating the contractor's right to proceed.

Subsequent to FEC's letter of March 29, 1966, the Air Force issued the following orders:

| Order number | Date | Quantity |
|---|---|---|
| 3 | March 30, 1966 | 292 |
| 4 | April 15, 1966 | 662 |
| 5 | May 10, 1966 | 8 |
| 6 | June 13, 1966 | 101 |
| 7 | June 14, 1966 | 199 |
| 8 | August 17, 1966 | 43 |
| 9 | November 7, 1966 | 443 |
| 10 | December 9, 1966 | 426 |

Plaintiff objected to receipt of each of these and, with the exception of orders number 9 and 10, individual appeals were taken from adverse decisions of the contracting officer regarding plaintiff's obligation to deliver the items.[3] Additionally, plaintiff objected to orders four and six on the separate basis that they had been expressly made to cover generators ordered but never delivered under a different contract with the Bogue Electric Company (Bogue) and, therefore, intended to mitigate that defaulting contractor's damages. Throughout this period, plaintiff adhered to its position, as outlined in the March 29, 1966 letter, that it would continue to perform, but under protest.

3. The following stipulation was submitted by the parties to the Board:

\* \* \* \* \*

"5. That appellant timely appealed from final decisions upholding the right of the Government to issue Orders 3 through 8 under the subject contract. Should the Board deter-

Plaintiff's appeals from the decisions of the contracting officer were consolidated before the Board. The Board decided for the Government, concluding:

(1) That the FEC contract came into effect on December 20, 1965, simultaneously with defendant's placing of the minimum order and, hence, was enforceable *ab initio*. Plaintiff was thus bound to supply all orders placed under the contract at the prices set forth therein.

(2) The contracting officer was entitled to issue orders under the subject contract to accomplish the reprocurement for the account of Bogue.

We will deal with these two issues separately in the sections which follow.

## II

### *Enforceability of the Indefinite Quantity Contract*

In deciding for the Government with regard to the enforceability of the FEC contract, we depart from the Board's reasoning.

An indefinite quantity contract provides for the furnishing of an undetermined quantity of supplies or services during a specified period. The advantages to the Government of this type of contract are clearly set forth in the applicable Armed Services Procurement Regulations (ASPR):

(i) Flexibility with respect to both quantities and delivery scheduling;

(ii) Supplies or services need be ordered only after actual needs have materialized;

(iii) The obligation of the Government is limited; and

(iv) It permits stocks to be maintained at minimum levels and allows direct shipment to the user.

mine that appellant was not obligated to accept orders under the contract subsequent to its letter of 29 March 1966 (Tab S, Rule 4 Documents for ASBCA No. 11726, and Tab M for ASBCA No. 11918), a decision by the ASBCA will affect Orders 3 through 10. \* \* \* "

32 C.F.R. § 3.409(c)(2) (1965). In order to avoid an attack upon this type of contract for lack of mutuality of obligation (*i. e.*, one party to the contract being obligated to perform while the other is not[4]), the contract must obligate the Government to order a stated minimum quantity. 32 C.F.R. § 3.409–3(a) (1972). *See* Willard, Sutherland & Co. v. United States, 262 U.S. 489, 493, 43 S.Ct. 592, 67 L.Ed. 1086 (1923).

■ Although the instant contract did provide for a minimum order of 453 generators, the contractor contends that, since the Government did not place the minimum order until three days after the effective date of the contract, the entire contract is unenforceable *ab initio* due to lack of mutuality of obligation.

The Government counters that the contract was enforceable because the minimum order was incorporated in or issued contemporaneously with the execution of the contract, and that plaintiff was entitled only to compensation provided for in the contract. In the alternative, the Government contends that, if the contract was unenforceable, plaintiff is barred from seeking additional relief because plaintiff performed and an unenforceable contract is enforceable to the extent that it is performed.

We deem it unnecessary to resolve the issue of enforceability *ab initio* since we accept the Government's alternative contention. The present case is governed by the Supreme Court decision of Willard, Sutherland & Co. v. United States, *supra*, where the Court held that an indefinite quantity government contract, unenforceable at its inception due to a lack of mutuality of obligation, became valid and would be enforced to the extent it was performed. *Id.* at 493–494, 43 S.Ct. 592.

This court applied the *Willard, Sutherland* rule to hold enforceable an indefinite quantity contract to the extent that orders had been placed by the Government under it, without determining whether or not the contract was valid *ab*

*initio.* Tennessee Soap Co. v. United States, 126 F.Supp. 439, 441, 130 Ct.Cl. 154, 158 (1954). This precedent squarely governs the situation at hand. The required minimum order having been satisfied, FEC's entitlement to compensation for supplying 2633 generator units, including the 2174 supplied following plaintiff's purported revocation, is governed by the terms of the subject contract.

Nor is this result affected by the fact FEC continued to perform after March 29, 1966 under protest. The contractor in *Willard, Sutherland* clearly stated that it was "doing this [*i. e.*, performing despite the unenforceability of the contract] under protest which can be straightened out later." The protest issue was also raised in Early & Daniel Co. v. United States, 271 U.S. 140, 46 S.Ct. 457, 70 L.Ed. 874 (1926), which involved an indefinite quantity contract to deliver hay. When a dispute arose over an alleged breach by the Government, the contractor stated:

> [W]e want it distinctly understood that we are doing this under protest and are going to put the matter up to proper authorities in Washington; and if they rule in our favor, [we] want settlement at fair market price for amount we overfill.

271 U.S. at 141, 46 S.Ct. at 457. This language is strikingly similar to that used in FEC's letter of March 29, 1966. Nevertheless, the Supreme Court held in *Early & Daniel* that the contractor had the option of delivering or not delivering. Having chosen to deliver, even under protest, the *Willard, Sutherland* rule applied and the contractor was bound to the contract price to the extent that the contractor performed. *Id.* at 142, 46 S.Ct. 457.

■ In an attempt to avoid the effect of the *Willard, Sutherland* rule, plaintiff raises two arguments which we feel are without merit. First, plaintiff contends that "under the contract" the Government's actions constituted a "change"

---

4. *See* 1A A. Corrbin, Contracts 152 (1950); 1 S. Williston, Contracts 105A (3d ed. 1957).

and that the disputes clause compelled continued performance under protest by plaintiff while pursuing an administrative adjustment. *See* Dynamics Corp. of America v. United States, 389 F.2d 424, 182 Ct.Cl. 62 (1968).

In *Dynamics Corp.* we held that plaintiff's performance under protest in order to comply with its contract's standard disputes clause distinguished its situation from the *Willard, Sutherland* and *Early & Daniel* precedents, in which disputes clauses were not present. No challenge was made, however, to the enforceability of the indefinite quantity contract in *Dynamics Corp.*; the dispute involved only performance by the contractor subsequent to the termination of the admittedly valid agreement. In the present case on the other hand, FEC seeks first to disavow the existence of the subject contract and then, by citing the *Dynamics Corp.* precedent, to take advantage of the disputes clause which is a part of that very agreement. We cannot abide this effort by the plaintiff to "come up under" the same contract it seeks to have nullified. Plaintiff "can't have it both ways."

■ Secondly, under its breach-of-contract theory, plaintiff contends that the *Willard, Sutherland* rule has been modified by recent cases which allow continued performance despite a pre-existing breach. *See, e. g.*, Northern Helex Co. v. United States, 455 F.2d 546, 197 Ct.Cl. 118 (1972). Plaintiff's reliance on *Northern Helex* is misplaced. Although the court there allowed continued performance without prejudice after a breach had occurred, the court emphasized that it takes "particular circumstances" in "specific cases" to warrant such action. The special circumstances of *Northern Helex (i. e.*, the processing and storing of helium, a valuable national resource, as a by-product of another chemical process) clearly distinguishes that case from the instant one.

Though we might find persuasive the contemporary view of performance under protest as restated in section 1–207 of the Uniform Commercial Code[5] and accepted by the court under the special circumstances of the *Northern Helex* case, we hesitate to extend this view in the face of a clear, contrary rule established and affirmed, albeit a half century ago, by the Supreme Court. We are reminded in this connection of the Court's recent expression of "difficulty in comprehending how decisions by lower courts can ever undermine the authority of a decision of [the Supreme] Court." United States v. Mason, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973).

In summary, we hold that the subject contract was enforceable to the extent that it was actually performed.

## III

### *The Bogue Reprocurement*

■ Having concluded that the instant contract was enforceable to the extent that it was performed irrespective of the contractor's protests, it is necessary to discuss plaintiff's secondary contention—that the Air Force was not entitled to place orders under the contract for the account and benefit of a defaulted contractor. We find that the Board's decision for the Government was correct as a matter of law.

Prior to the execution of the instant contract, the Air Force was having difficulties with Bogue, another supplier of the same generators. A contract with Bogue was terminated for default on November 19, 1965, thus necessitating a reprocurement to satisfy the requirements of that agreement. Accordingly, the Government on January 31, 1966 issued a reprocurement RFP. FEC responded to this new RFP. The bid price was substantially higher than the one which resulted in the FEC December 1965 contract, yet was still the lowest bid submitted in response to the reprocurement

---

5. "A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. * * *"

RFP. Rather than issue a new contract, the Government on or about February 21, 1966 offered FEC additional consideration to permit the Government to reprocure the Bogue units under the original FEC contract. FEC rejected this proposal. The Government then decided to utilize the existing contract to satisfy its reprocurement needs. Accordingly, the Air Force issued the fourth and sixth delivery orders under the original contract on April 15, 1966 and June 13, 1966 for 763 units which had been ordered but not delivered under the Bogue contract. Plaintiff delivered these units, as all others in question, under protest.

FEC contends that the Government was not entitled to reprocure the Bogue requirements under the instant contract, since it was clear that a substantial loss to FEC would result from said reprocurement. The grounds for this position are first that the Board erred in interpreting 32 C.F.R. § 8.602–6(a) (1965), requiring that the contracting officer reprocure at "as reasonable a price as practical," to mean the "lowest practical price." Secondly, plaintiff cites the "mistake in bid" cases for the proposition that its original contract was a mistake and thus could not be utilized as the basis for the reprocurement. *See* Royal Pioneer Paper Box Mfg. Co., 69–1 BCA ¶ 7631; Octagon Process, Inc., 65–2 BCA ¶ 5168.

We deem it unnecessary to reach these difficult questions in this case because we hold that, as far as FEC was concerned, orders four and six were subject neither to reprocurement nor new-contract guidelines because they were merely additional orders under a pre-existing contract.

■ Admittedly, it appears harsh to place the financial burden of Bogue's default upon plaintiff. Nevertheless, by the terms of the FEC contract the Government was free to order up to 3600 generators within one year, regardless of the reason why said generators were needed. As long as orders four and six did not result in the quantity limitations of the original contract being exceeded and were consistent in all other respects

with the specifications of the contract, there was nothing to prohibit the Government from placing the orders under the original contract. The fact that these were reprocurement orders is relevant only to the Government's duty to mitigate damages to the defaulted contractor. In an effort to accomplish this goal, the contracting officer is not limited to specific methods of reprocurement, but rather is given broad discretion. Astro-Space Laboratories, Inc. v. United States, 470 F.2d 1003, 1017, 200 Ct.Cl. 282, 308 (1972).

■ Plaintiff finally contends that the parties' negotiation for reprocurement under the FEC contract (but at a higher consideration) represented a contemporaneous interpretation by the parties that defendant was not entitled to accomplish the Bogue reprocurement under the subject contract according to its original terms, an interpretation that should be given great weight by the court. *See, e. g.,* Dynamics Corp. of America v. United States, supra, 389 F.2d at 430, 182 Ct.Cl. at 73. We reject this assertion because of its speculative nature. The fact that defendant initially considered increasing plaintiff's compensation does not necessarily mean defendant felt it could not procure under the original terms of the FEC contract, especially since defendant ultimately did exactly that. Hence, we do not feel the alleged contemporaneous interpretation merits sufficient weight to rebut our decision that the procurement of 763 generators under the FEC contract was proper.

In light of the foregoing, we conclude that the Board's decision withstands Wunderlich review, though we reject some of the Board's reasoning in reaching this result. Because the subject contract is found enforceable to the extent performed and the Bogue reprocurement was proper, plaintiff's breach-of-contract arguments are without merit. For the same reasons, we find it unnecessary to reach plaintiff's fifth amendment allegations.

Accordingly, plaintiff's motion for summary judgment on counts I, II and III is denied; defendant's cross motion for summary judgment on counts I, II and III and its motion for summary judgment on counts IV and V are granted; and the petition is dismissed.

NICHOLS, Judge (concurring):

I join in the judgment of the court, but I would not reject the reasoning of the Board, 68–1 BCA § 6834, or any substantial part thereof. Its handling of the contentions also made here I find simple, sound, and convincing. One beauty (among many) of the Board's opinion is that it avoids the Scylla and Charybdis between which this court, on its chosen course, must pass: that is, either we must ignore what we call "the contemporary view of performance under protest" or we must presumptuously overrule some elderly Supreme Court decisions. Since we can't "undermine" their authority, I hope it is true we can't add to it either.

DAVIS, Judge (dissenting in part):

I join Parts I and II of the court's opinion, but on the Bogue reprocurement (Part III) I differ. In my view the parties did not contemplate, when they made this contract, that the Government would be able to use the agreement as a vehicle for reprocuring items under someone else's defaulted contract, where FEC would suffer a loss through such an order (and therefore objected to it). It seems to me most unlikely that, if the question had been raised during the negotiations, FEC would have agreed that it was obligated to fill the order. To do justice, I would construe the contract, despite its all-embracing language, as not covering this particular situation.

To sanction what was done here is to permit the defendant to elect to bail out Bogue at the expense of FEC—which had, of course, nothing to do with Bogue's transgression. The defendant was not obligated to Bogue to use FEC as the reprocurement vehicle. The ASPR regulation, 32 C.F.R. § 8.602–6(a) (1965), calling for reprocurement at "as reasonable a price as practical," does not direct that the reprocurement order must be given to a low offeror who finds out he has bid too low because of a mistake. Octagon Process, Inc., ASBCA No. 10371, 65–2 BCA ¶ 5168. Similarly, this standard of "as reasonable a price as practical" would not require reprocurement under plaintiff's contract which likewise had set the price too low because of mistake. On this basis that the Government was legally free to reprocure elsewhere, I would hold it overreaching, and not within the parties' reasonable contemplation, to insist on reprocuring under the FEC contract although it was by then known to be a loss arrangement. Bogue, not the innocent plaintiff, should bear that portion of the loss.

The rationale of *Willard, Sutherland & Co., supra,* does not, in my view, control this aspect of the case because the two Bogue reprocurement orders were an authorized constructive change in the original coverage of the contract, entitling plaintiff to an equitable adjustment. With respect to a changes claim "under the contract," the contractor is required to continue performance, and by doing so does not forfeit his claim for additional payment. There is no problem of invalidity on this portion of the case. The defendant affirmatively asserts the full validity of the contract, and the plaintiff assumes it, and must assume it, for this facet of its claim.