**CROWN LAUNDRY AND DRY CLEANERS, INC.,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 91–1224C.**

United States Court of Federal Claims.

Sept. 22, 1993.

Jesse W. Rigby, Pensacola, FL, for plaintiff.

Thomas D. Dinackus, Washington, DC, with whom were Acting Asst. Atty. Gen., Stuart E. Shieffer, Director David M. Cohen, and Asst. Director James M. Kinsella for defendant. Maj. J. Mackey Ives, Army Litigation Center, Arlington, VA, of counsel.

### ORDER

LYDON, Senior Judge:

This case comes before the court on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment. Crown Laundry and Dry Cleaners, Inc. (Crown) has sued in this court seeking money it expected to recover from a contractual arrangement with the United States to provide the government with laundry and dry cleaning services. The thrust of Crown's complaint is that the government negligently overestimated the extent to which it would use Crown for its laundry and dry cleaning services, and this overestimation, which was integral to the formation of a contract, caused Crown to outlay funds it was not able to recover when the government's initial projections turned out to be deficient. The court must answer two questions: whether the subject contract was a requirements contract instead of an indefinite quantity contract, and if so, whether the government negligently overestimated the work that Crown would be required to perform under the contract. In its motion, but not in its pleadings, defendant also seeks to recover sums it paid Crown under a contract modification. After considering the parties' submissions and oral argument, the court concludes that the subject contract should be deemed a requirements contract.

### FACTS

For at least a year prior to October 1988, laundry services at the U.S. Missile Command at Redstone Arsenal, Alabama (Redstone Arsenal), were handled by Holmes & Narver, the prime contractor, which subcontracted the entire contract to Aratex, an Alabama company. Under this contract, Redstone Arsenal leased linens, towels, and similar items from Holmes & Narver and paid them a set monthly rate regardless of the number of laundry items supplied. There was no estimated quantity provision in the Holmes & Narver contract. This contract was principally administered by the Contracting Officer, Johnny Kilpatrick (Kilpatrick), Bonnie Kerschner (Kerschner), a Contract Specialist, and Charles Mayes (Mayes), the Contracting Officer's Representative (COR). The Holmes & Narver contract covered the period from October 1, 1987 to September 30, 1988.

At some point before contract performance with Holmes & Narver was completed, Redstone Arsenal engaged in a search for contractors to provide laundry services after September 30, 1988. Redstone Arsenal decided to purchase its own laundry items and have a contractor clean and service the items. Whereas under the Holmes & Narver contract the number of items to be cleaned, serviced, and repaired apparently was not critical to the contract price, under the new proposal the number of items to be serviced would be critical to formulating the contract price.

Kerschner drafted a solicitation proposal, which was framed as a request for a con-

tract proposal to provide laundry and dry cleaning services with an opportunity for prospective contractors to negotiate with the government to reach a best and final offer. The solicitation included standard contract clauses, which were assembled by Kerschner, but also needed to identify the laundry needs of each participating unit at Redstone Arsenal—the "using activity requirements"—which would in turn be used to generate quantity estimates to be given to bidders. The solicitation was put out for bids on or about June 8, 1988.

To assemble the using activity requirements, Mayes turned to Bobby Gene Sheppard (Sheppard), head of the Installation Contracts Management Office at Redstone Arsenal, which had the responsibility for dictating the requirements of the contract. Sheppard reported to the Commander of Redstone Arsenal Support Activity (RASA), which had recommended that the installation's laundry contract be resolicited. In order to determine the quantity estimates that were to be put in the solicitation, Mayes asked using activities throughout Redstone Arsenal to determine the types and quantities of laundry and dry cleaning services they would require for the contract. In his deposition, Mayes stated that he felt the only information necessary to put into the solicitation was that information on quantities submitted by the using activities. These requests were sent out sometime in 1987. After receiving the estimates from the activities, Mayes compiled the results and sent them to procurement as quantities needed by the using activities. These estimates from the using activities constituted the sole source of information used to prepare materials for the solicitation. The estimates obtained from the using activities spanned monthly periods. Kerschner testified that she multiplied these monthly estimates by twelve to reach the yearly estimate figures used in the solicitation on which bidders premised their bids.

In his capacity as COR for the Holmes & Narver contract, Mayes received Holmes & Narver invoices for monthly payments, along with pickup and delivery tickets. While the invoices would not show the items serviced, the pickup and delivery tickets presumably would show the types and number of specific items supplied by Holmes & Narver. It should be noted again that the Holmes & Narver contract was based on one monthly price covering all items supplied in that month; thus, the number of items used in any one month may or may not have related to the monthly rate paid. Although Mayes maintained the Holmes & Narver records on file, he did not compare these records with the information he received from the various Redstone Arsenal using activities when considering the preparation of the solicitation for the October 1, 1988 contract. Mayes also noted that Kerschner had asked him if there were any records that would show historical laundry usage by units; in response, Mayes stated that he sent the Holmes & Narver pickup and delivery tickets to Kerschner at the Redstone procurement office in or around June 1988. Kilpatrick testified that his office (where Kerschner also worked) had asked for these tickets, but indicated that the request had been made because of litigation that Holmes & Narver had started before the Armed Services Board of Contract Appeals. Kilpatrick states that the tickets were not delivered to be used to prepare or confirm the estimated quantities for the solicitation. Crown contends these pickup and delivery tickets should have been examined to verify the accuracy of the estimates obtained from the using agencies. The government says there is no evidence that the pickup and delivery tickets pertaining to the Holmes & Narver contract were available to the procurement office at the time the solicitation was prepared or, if available, that they would have been useful to test the accuracy of the using activities' estimates. Crown insists that at the very least this demonstrates that there were data that could have provided comprehensive quantity information spanning the life of the Holmes & Narver contract that the procurement office should have examined.

Over at the Installation Contracts Management Office, Sheppard was aware of the existence of the delivery and pickup

tickets from Holmes & Narver, and knew that the pickup and delivery tickets would show what Holmes & Narver had laundered and provided to the Command under their contract. According to his deposition testimony, Sheppard did not verify the requirements received from using activities or compare that information to past usage reflected in the Holmes & Narver pickup and delivery tickets. Sheppard felt that those in charge of determining laundry requirements knew what the usage requirements would be, and presumably had some type of records to verify the usage requirements they fashioned in response to his requests.

Sheppard testified that the contracting officer had the authority to direct the project manager at Holmes & Narver to deliver to the government documents which would have clearly definitized the amount of laundry services provided by Holmes & Narver between October 1, 1987 and June 1988, and further noted that in June 1988, at the time the solicitation for Crown's contract was issued, Redstone Arsenal had the capability of updating the estimate information received from using activities during the summer of 1987. As noted above, Kerschner testified that she determined the quantity estimate placed in the solicitation by multiplying the monthly estimates from using activities by twelve. The estimates, which became § B of the solicitation, were not further verified by Kerschner. She testified that she worked off the requirements estimates she received, and did not compare these estimates with any historical data.

Kilpatrick testified that at some point before October 1988, in response to a claim filed by Holmes & Narver with the Armed Services Board of Contract Appeals, he asked Mayes to bring the Holmes & Narver pickup and delivery tickets to his office. He stated that although the tickets would have shown the amount of laundry processed by Holmes & Narver, the tickets were not used to determine the quantities revealed to bidders in the solicitation materials at issue in this case. Kilpatrick further testified that it was the responsibility

of RASA to verify that the information received from using units was accurate, and although he "questioned some of the quantities" that the using activities had provided, he was unable to verify whether RASA did indeed check for accuracy. Kerschner testified that Mayes made "some corrections" in the work quantities (not described with any particularity), and that she herself "may have helped". verify the accuracy of the estimated quantities, but does not clearly recall doing so.

In summary, the estimates at issue in this case were prepared on the basis of the per month estimates of laundry and dry cleaning needs by using activities at the Redstone Arsenal. These monthly estimates were multiplied by twelve to arrive at the yearly estimates for numerous laundry and dry cleaning items, which were subsequently inserted in the solicitation that formed the basis of the contract. It is conceded that the estimates were inaccurate. It also appears that some of the quantities estimated by the using activities were suspect and that exaggeration by using activities was a possibility recognized by Mayes, the COR. On the present record, it would appear that no significant effort was made to verify the reasonable accuracy of the estimates from the using activities.

After these preparatory events, the Redstone Arsenal procurement office issued solicitation DAAH03–88–R–F062 (the solicitation) in June 1988 seeking bids to provide laundry and dry cleaning services at the installation. Among the bidders for the contract was Crown. On June 14, 1988, prior to award of the contract, Crown wrote to Kerschner requesting information relative to the Holmes & Narver contract. Specifically, Crown inquired about the total cost of the contract, contractor invoices for the past twelve months, and any contract modifications in an effort to verify the estimates set forth in the June 1988 solicitation. Crown's president was told, presumably by phone, that the requested documents were not available. Crown's president stated in his deposition that he did not know the legal distinction between an in-

definite quantities contract and a requirements contract, but he did understand that it was critical for the estimates to be reasonably accurate. He felt that a five to fifteen percent variation between the estimate of work and the work actually performed would be reasonable, but considered a forty percent or more variation to be unreasonable. He also expected that Crown would service all the Arsenal's laundry and cleaning needs for the one year period of the contract.

Pursuant to the terms of the solicitation, Crown was required to prepare a unit price bid based on the estimated quantity per year for each category of supplies or services listed in § B of the solicitation. Crown relied on the solicitation's estimates to prepare its unit price bid, which included anticipated costs, expenses, and profit. On October 1, 1988, the contract was awarded to Crown, the same date that the contract became effective and performance was to begin.

In accordance with § C, paragraph 3, of the contract, Crown was required to furnish all labor, equipment, operating supplies, linen bags, tools, packaging materials, and transportation to provide full laundry, dry cleaning, and minor clothing and linen repair services according to the conditions and delivery schedule set forth under specifications for each organization listed in the contract's work statement. The contract provided for an initial one-year term and four one-year option periods which could be exercised in accordance with contract terms. With respect to contract performance, § H–6 of the contract provided that Crown was required to obtain all permits, give all notices, pay all license fees and taxes, and comply with all health ordinances and regulations applicable to business carried out under the contract. Section H–13 detailed various contract contingencies, among them being that "[t]he contractor shall be required to respond to abnormal situations ... in order to ensure continuity of all operations," and that "[r]equirements in abnormal situation(s) over and above those specified in the contract shall be subject to an equitable settlement."

The first page of the contract characterized the agreement between Crown and the government as a "Firm Fixed Price Indefinite Quantity" contract, with an "Estimated Yearly" contract amount of $375,352.00. At the end of each year's projections of the government's needs, an appended typewritten "Note # 4" provided that "[t]he contractor shall be paid the Firm–Fixed Unit Price for the number of items processed within the limits of the estimated quantities and estimated total price." Section H–22 of the contract, entitled "Indefinite Quantity" stated: "This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services in the Schedule are estimates only and are not purchased by this contract." Notwithstanding these terms, it is clear that Redstone Arsenal intended to send to Crown all laundry and dry cleaning services required under § B of the contract and that it neither intended to nor did it send any work that could have been covered by § B to any other contractor. There was no provision in the contract reserving to the government the right to perform those laundry and dry cleaning services in-house. While the contract did not contain a clause or other language that stated, *in haec verba*, that it was a requirements contract, the deposition testimony of Kerschner, Mayes, and Kilpatrick supports the view that it was the Command's intention that Crown would service all of the laundry requirements for the using activities listed in the contract, and that there would be only one laundry and dry cleaning contract per year at Redstone Arsenal. The deposition testimony of government personnel, which was consistent on this point, was not challenged or disputed in this regard. Indeed, plaintiff's proposed finding of fact No. 2, which read, "[T]he Government intended to send to Crown Laundry and Dry Cleaners, Inc. ("Crown") and did send, all supplies/services covered by § B of the contract which required cleaning or repair," was "not disputed" by defendant.

About a month after Crown had started contract performance, it became apparent that the quantity estimates contained in § B of the contract were inaccurate. Redstone Arsenal had sent to Crown only sixty percent of the work it said it would in the contract. Crown wrote to Kilpatrick on November 3, 1988 to inform the installation of the shortfall in the quantity of laundry to be serviced as follows:

The subject contract was bid on an estimated quantity of 670,080 pieces per year. This equates to an average of 55,840 pieces per month. For the full month of October, only 33,909 pieces were processed. This is 40% less than the monthly estimate.

We feel obligated to bring this to your attention inasmuch as our bid price is predicated on meeting the volume stated in the contract. The price for processing only 60% of the estimate will not cover operating expenses, much less allow a modest profit.

*One of the criteria which must be met in drafting a requirements contract is the inclusion of a realistic estimated total quantity in the solicitation.* The contracting officer must base his estimate on the most current information available. [Emphasis supplied.]

We trust that our present concerns will be allayed by an increase in quantity equal to or greater than the estimate in the contract.

In subsequent months, Crown continued to apprise Kilpatrick of the continuing estimated quantity shortfall. Crown also attempted to work out a resolution of the problem but its efforts fell on deaf ears. While the contracting officer and other Redstone Arsenal personnel met to discuss the matters covered by Crown's letters, it was decided that nothing would be done with respect to its complaints, but that in the meantime they would resolicit for laundry and dry cleaning services to be performed after the expiration of the contract on September 30, 1989. While the contracting officer felt that Crown "may have a legitimate complaint here," and wanted to "see if we can't work it out," his views did not prevail. Redstone Arsenal clearly expected to receive a claim at the end of the contract year. There is no evidence that Redstone Arsenal ever responded to Crown's November 3, 1988 letter or any subsequent letter. Crown completed its contract on September 30, 1989. The service and work actually performed under Crown's contract constituted approximately fifty-five percent of the estimated work set forth in § B of the contract, *i.e.*, the estimated workload set forth in § B was short approximately forty-five percent.

On July 18, 1989 RASA resolicited for a laundry and dry cleaning services contract which would begin on October 1, 1989. In response to this resolicitation, Crown filed a protest with the General Accounting Office on the ground that the quantity estimates set forth in the solicitation, although reduced by approximately one-third from those set forth in Crown's contract, were still overstated by about seventeen percent. Thereafter, RASA modified the quantity estimate in the solicitation so that it would be more consistent with actual laundry and dry cleaning usage experienced during the period of Crown's contract. Crown did not successfully bid on the amended solicitation.

■ Crown submitted an amended certified claim to Kilpatrick for $122,944.00 plus interest in accordance with the Contract Disputes Act. According to Crown, the claim was "predicated on the fact that the quantities of pieces to be laundered or dry cleaned listed in [the solicitation] were not estimated with due care. This negligent act, Crown asserts, prevented Crown from recovering its full overhead, delivery, and G & A costs for the base year of the contract." By letter dated July 26, 1990, Kilpatrick issued his final decision on the claim, finding that Crown was entitled to recover $41,524.00 from the government based on the estimate shortfall. The record does not clearly indicate how the Kilpatrick reached this figure. There is no indication that his determination was based on any audit or examination of Crown's records. Reflecting this decision, the Kilpatrick thereafter issued a unilateral contract

modification on September 19, 1990. The modification effected an equitable adjustment of $45,383.71, i.e., the $41,524.00 awarded by the contracting officer in July 1990 plus $3,859.71 in interest.[1] Plaintiff has been paid the amounts covered by this contract modification.

Crown appealed the contracting officer's final decision by filing suit in this court on June 17, 1991. At the start of this suit, plaintiff sought the balance of the claim that had not been allowed by the contracting officer's equitable adjustment, $81,420.00 ($122,944.00–$41,524.00). Thereafter, an accountant re-evaluated Crown's costs in performing the contract for the one year. As a result of this analysis, Crown and the government have stipulated that Crown incurred damages of $99,810.29 as a result of the inaccurate estimates in the contract. Thus, if Crown is found to be entitled to an award of $99,810.29, it will be entitled to receive as a judgment $58,286.29 ($99,810.29–$41,524.00), plus interest back to the date of Crown's claim to the contracting officer. It would appear that Crown submitted a certified claim to the contracting officer on March 2, 1990, which was received by the contracting officer on March 7, 1990. Under the Contract Disputes Act, 41 U.S.C. § 611, interest would run from March 7, 1990, the date the contracting officer received the claim.

## DISCUSSION

Both parties have moved for summary judgment, contending that there are no genuine issues of material fact and that judgment can be rendered as a matter of law. The parties have submitted affidavits, excerpts from depositions, and other related materials in support of these motions.

Summary judgment is appropriate where there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. Id. Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In the capacity of opposing each other's motion, plaintiff and defendant have the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. Id. at 324, 106 S.Ct. at 2553. In resolving the cross-motions, the court cannot weigh the evidence and determine the truth of a particular matter. Anderson, 477 U.S. at 255, 106 S.Ct. at 2513. Any evidence presented by the opponent is to be believed and all justifiable inferences are to be drawn in its favor. Id.

As indicated previously, the parties first dispute the type of contract the parties executed. Crown maintains the contract was a requirements contract whereas the government contends the parties intended to enter into an indefinite quantity con-

---

1. The government attacks the contracting officer's actions in this regard, contending that because the contract was designated an indefinite quantity contract, yet lacked the necessary minimum quantity clause needed to effectuate such contract, the contract must be deemed unenforceable, and thus the contracting officer's issuance of the unilateral modification was in error. The government concedes, however, that Crown is entitled to be paid for the actual services it rendered. It is not unreasonable to view the C.O.'s modification as doing just that. Because of the shortfall, the allocation of costs was spread out over fewer items, thereby increasing the costs of those items that were serviced. The modification, in effect, merely enabled Crown to receive a fair and reasonable price for the services it did perform. In this respect, the modification was within the ambit of the C.O.'s authority. Kilpatrick testified at his deposition that reasonable accuracy of the contract estimates was absolutely necessary for a contractor to bid a fair price and that a contractor needs to know what he is going to receive for his services in order to spread out his costs over the range of anticipated revenues.

tract. If Crown is correct in its position that it entered into a requirements contract, the court must then confront the second issue, which concerns the viability of the estimates of work set forth in the contract. It is conceded that the estimates in question were inaccurate. Crown claims that the government did not use reasonable care or was negligent in the preparation of the estimates and these action produced the inaccurate estimates. The government offers no explanation for the inaccurate estimates but maintains that the estimates were prepared with reasonable care and not in a negligent manner. A third issue, raised by defendant in its briefs but not set forth in its answer, concerns the unilateral contract modification issued by the contracting officer in which additional monies were paid to Crown in recognition of the loss it had suffered because of the inaccurate work estimates. The government seeks to recover the monies paid under the modification on the grounds that the contract was unenforceable and thus the contracting officer was without authority to make any such payment to Crown.

## A. Characterizing the Contract

▮ Pure contract interpretation is a question of law which may be resolved by summary judgment. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984); *H.B. Zachry Co. v. United States*, 28 Fed.Cl. 77, 80 (1993). But, the question of interpretation of language, the conduct, and the intent of the parties, *i.e.*, the question of what is the meaning that should be given by a court to the words of a contract, may sometimes involve questions of material fact and not present a pure question of law. *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988); *Bayou Land & Marine Contractors, Inc. v. United States*, 23 Cl.Ct. 764, 771 (1991). When necessary to best interpret the contract, the court should examine the materials the parties have submitted pursuant to RCFC 56(c) and 56(d). Should a genuine issue of material fact be presented, summary judgment would be inappropriate. In this case, though, the question of whether this con-

tract was for requirements or indefinite quantities does not involve any factual disputes that are material to interpreting the contract, *see H.B. Zachry Co.*, 28 Fed.Cl. at 80, thus summary judgment may be used to resolve this question. Further, determination of the type of contract the parties entered into is generally a matter of law. *Maintenance Engineers, Inc. v. United States*, 749 F.2d 724, 726 n. 3 (Fed.Cir. 1984).

There are three possible types of supply contracts: those for a definite quantity, those for an indefinite quantity, and those for requirements. *Torncello v. United States*, 231 Ct.Cl. 20, 28, 681 F.2d 756, 761 (1982); *Mason v. United States*, 222 Ct.Cl. 436, 444, 615 F.2d 1343, 1347 (1980). It is conceded the contract in issue was not one for a definite quantity. The question, as posed earlier, is whether the contract is one for an indefinite quantity or for requirements.

▮ In determining which type of contract was entered into by the parties, the court will be guided by three contract interpretation rules in particular. First, the court is not bound by the name or label given to a contract. Rather, it must look beyond the first page of the contract to determine what were the legal rights for which the parties bargained, and only then characterize the contract. *See A–Transport Northwest Co. v. United States*, 27 Fed.Cl. 206, 214 (1993); *Ralph Constr., Inc. v. United States*, 4 Cl.Ct. 727, 731 (1984); *Mason v. United States*, 222 Ct.Cl. 436, 442, 615 F.2d 1343, 1346 (1980). Second, an interpretation that gives meaning to all parts of the contract is preferable to one which renders provisions in the contract meaningless or superfluous. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985). "Contracts are instruments of commerce and one ought to assume, therefore, that the language they recite was drafted with necessities of the transaction in mind." *Bel Pre Health Care Center, Inc. v. United States*, 24 Cl.Ct. 495, 498 (1991). Third, because it must be assumed that the parties intended to form a binding contract, the court should

favor an interpretation that saves the contract instead of voiding it. *Torncello v. United States,* 231 Ct.Cl. 20, 27, 681 F.2d 756, 760 (1982). If a contract is susceptible of interpretation as either a requirements contract or an indefinite quantity contract, the court should uphold it as being a requirements contract. *A–Transport Northwest Co.,* 27 Fed.Cl. at 214. In any event, "[t]here is no surer way to find out what the parties meant, than to see what they have done." *Insurance Co. v. Dutcher,* 95 U.S. 269, 273, 24 L.Ed. 410 (1877).

The court's task is to determine whether the contract in issue should be deemed to be an indefinite quantity contract or a requirements contract. The indefinite quantity contract was described in *Mason,* 222 Ct.Cl. at 443 n. 5, 615 F.2d at 1346 n. 5, as follows:

> An indefinite quantities contract is a contract under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller....
>
> To make such contracts enforceable, the buyer must agree to purchase from the seller at least a guaranteed minimum quantity of goods or services. If the contract contains such a minimum quantity clause, the buyer is required to purchase at least this minimum amount, but this is the extent of his legal obligation. He can purchase more if he chooses to but is under no obligation to do so.

On the other hand, the requirements contract was described in *Modern Systems Technology Corp. v. United States,* 979 F.2d 200, 205 (Fed.Cir.1992) (citations omitted) as follows:

> A requirements contract is formed when the seller has the exclusive right and legal obligation to fill all of the buyer's needs for the goods or services described in the contract. Thus, an essential element of a requirements contract is the promise by the buyer to purchase the subject matter of the contract exclusively from the seller.

■ In urging the court to find the contract to be for indefinite quantities, the government stresses the fact that the contract labels itself as an indefinite quantities contract and included an indefinite quantities contract clause (§ H–22).[2] The language the government relies on simplistically suggests that the parties entered into such a contract. Case law warns that reliance on labels and contract provisions is most risky. In any event, the determination of the type of contract the parties entered into is a matter of law and is not controlled by any label or contract provision. *Maintenance Engineers, Inc.,* 749 F.2d at 726 n. 5. Other than the contract language referred to above the government offers nothing else to persuasively bolster its position that the court should deem the contract to be one for indefinite quantities.[3]

---

**2.** Crown suggests that the wrong clause was inadvertently inserted into the contract, pointing out that the first two sentences of the standard FAR requirements clause [FAR 52.216(a) ] is exactly the same as the first two sentences of the standard indefinite quantity clause [FAR 52–216.22] except for the words "indefinite quantity" and "requirements."

**3.** In its response to Crown's motion for summary judgment, the government argues that the subject contract contains a patent ambiguity. Specifically, the government says that the contract is patently ambiguous because "[n]o contract can be both a requirements contract and an indefinite quantity contract," and also because the contract "did not contain a guaranteed minimum quantity clause, which must be included in an indefinite quantity contract in order for it to be enforceable." Having alerted the court to this supposed patent ambiguity, the

government cites the general rule that if there is a patent ambiguity in the contract, *i.e.,* a discrepancy that would be obviously apparent to a reasonably prudent contractor, a duty arises on the non-drafting party to inquire as to the meaning of the conflicting provisions. *Bayou Land & Marine Contractors, Inc. v. United States,* 23 Cl.Ct. 764, 773 (1991).

The contractor's "duty to inquire" is well-settled in this court. The Court of Claims in one case explained:

> While ambiguous contract provisions are construed against the author, and a contractor is not usually obligated to seek clarification of all interpretative problems inhering in the contract terms, he must nevertheless inquire where the discrepancy, omission or conflict is obvious, and most particularly so when a specification provision affirmatively warns him of such possible discrepancies in the plans, or where a contract article requires

Merely because the contract at issue is labeled an "Indefinite Quantity" contract and contains an indefinite quantity provision (§ H–22) does not, without more, require that it be deemed an indefinite quantity contract.

■■■ The undisputed facts do not support the government's argument on the issue of characterization. The contract does not contain any minimum quantity provision necessary to enforce an indefinite quantity contract. Without such a provision the contract is illusory and unenforceable. *Mason,* 222 Ct.Cl. at 443 n. 5, 615 F.2d at 1346 n. 5. Accordingly, the court cannot deem the contract to be one for indefinite quantities regardless of the intent and conduct of the parties. Indeed, if a contract is susceptible to either interpretation under these circumstances, the court should uphold the contract as being for

requirements. *Ralph Constr. Inc.,* 4 Cl.Ct. at 732. As indicated earlier, courts favor validating contracts, not invalidating them, especially when the contract has been fully performed.

■■■ Recognizing the thrust of the above discussion, the government argues that the contract at issue cannot be deemed a requirements contract because the contract did not include the requirements clause specified in FAR. As noted above, the determination of the type of contract the parties entered into is a question of law and is not controlled by labels or contract provision. If the presence of a requirements clause in the contract does not preclude the court from determining that the contract is an indefinite quantities contract, *see Maintenance Engineers, Inc.,* 749 F.2d at 726 n. 5, then the absence of a requirements clause in the contract likewise does

---

him to submit detected discrepancies to the contracting officer for his decision. *Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1044 (1972) (citations omitted) (*quoting Jefferson Constr. Co. v. United States,* 176 Ct.Cl. 1363, 1368–69, 364 F.2d 420, 423 (1966)). The contractor must express its concern about an obvious ambiguity if, "subsequent to an award to it, hopes to rely on its unilateral resolution of the discrepancy issue as a basis for a subsequent contract price adjustment claim." *Maintenance Engineers, Inc. v. United States,* 21 Cl.Ct. 553, 560 (*quoting Wickham Contracting Co., Inc. v. United States,* 212 Ct.Cl. 318, 323–24, 546 F.2d 395, 398 (1976)).

The court agrees with the government that patent ambiguities continue to place on the contractor a duty to inquire, but cannot agree that this principle has any application in this case. A survey of court opinions that address this issue indicates clearly that the duty to inquire is implicated in those instances in which there an ambiguity that relates to the actual performance of the contract, *i.e.,* instances in which the contractor could have made certain what the contract called for, thereby minimizing the risk that litigation would eventually be necessary to resolve problems that could have been resolved before performance began. *See, e.g., Gen. Eng'g & Mach. Works v. O'Keefe,* 991 F.2d 775, 781 (Fed.Cir.1993) (contractor included material handling costs in its overhead pool instead of a separate cost pool demanded by regulations); *Interstate General Gov't Contractors v. Stone,* 980 F.2d 1433, 1435 (Fed.Cir.1992) (contractor had to absorb cost of installing more expensive motors—contractor failed to ask about an obvious discrepancy as to what type of motor should have been used); *Maintenance Engineers, Inc. v. United States,* 21 Cl.Ct. 553, 562 (1990) (contrac-

tor failed to investigate an obvious error in square footage in drawing and was forced to absorb costs); *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 5, 314 F.2d 501, 503 (1963) (contractor decided for itself that weather-strips were required solely for the doors and not for windows). In the present case, there was never any dispute about Crown's performance of the services it contracted to provide. The dispute in this case is not about design, specifications, auditing, or anything similar—the dispute is whether Redstone Arsenal properly prepared the estimates relied on by Crown in its calculation of performance costs. The apparent ambiguity, which the government says should prevent recovery of Crown's full costs, is merely a dispute as to how the contract should be characterized. Unlike the factual questions addressed by the court in the duty-to-inquire cases, contract characterization is a purely legal issue that can only be resolved by the court summarily.

Even if the patent ambiguity rule were somehow to apply in this matter, a contractor's duty to inquire only arises when the contractor is attempting to work an ambiguity in the contract to his advantage. As the Court of Claims put it in *Beacon,* "when [the contractor] is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government's representatives if he intends to bridge the crevasse in his own favor." *Beacon Constr. Co.,* 161 Ct.Cl. at 7, 314 F.2d at 504. No similar facts are presented here. Crown never acted as though the contract was for indefinite quantities or as though the contract was unenforceable. From Crown's perspective, the contract was in essence and in fact a requirements contract, and is not relying on· any contract ambiguity in support of its claim.

not inhibit the court from deeming the contract to be a requirements contract. In *Maintenance Engineers* the contract contained the FAR requirements provision, but the Federal Circuit nonetheless found the contract to be one for indefinite quantities.

 In *Ralph Constr., Inc.*, 4 Cl.Ct. at 731, the Federal Circuit observed that a requirements contract "requires that the contractor have the exclusive right and legal obligation to fill all the government's needs for work of the kind described in the contract and that the government will purchase those needs from no one other than the contractor." The government does not take issue with this proposition but contends there is no clause in the contract which specifically sets forth this proposition. The government is correct in this regard but this proposition embodies what the parties intended when they entered into the contract. Government personnel connected with this contract, including the contracting officer, testified that the government intended to have Redstone Arsenal's using agencies have all their laundry and dry cleaning needs, set forth in the contract, serviced by Crown. During the contract term, none of these needs was to be serviced by any other contractor or by the government itself.[4] Kilpatrick testified that Crown was expected to fill all of Redstone Arsenal's laundry and dry cleaning needs specified in the contract. These requirements, while not spelled out in the contract *in haec verba*, manifest the clear intent of both parties and bespeak a requirements contract. *See Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed.Cir.1992); *Ralph Constr., Inc.*, 4 Cl.Ct. at 731.

The facts relied on to establish the government's intent to enter into a requirements contract are undisputed. The intent of the parties is the ultimate legal conclusion not a factual matter. *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 72, 389 F.2d 424, 429–30 (1968). The primary function of the court is to ascertain the intention of the parties. *Id.* The totality of the materials before the court persuades it that the parties intended the contract to be for requirements.[5]

---

4. The government argues that the contract at issue is not a requirements contract because at no place in the contract does the contract legally obligate the government to send all its work to Crown. The government's assertion is contrary to the intent of the parties as expressed in the deposition excerpts of government personnel and the affidavits and depositions of Crown's personnel. Moreover, the government's position is further weakened by the fact that the contracting officer responsible for all phases of the contract issued a unilateral modification awarding Crown additional monies as an equitable adjustment because of the inaccurate estimates. His actions in this regard are entirely consistent with a requirements contract, but completely inconsistent with an indefinite quantities contract. Also, the conduct of the contracting officer suggests, rather persuasively, that his view of the type of contract intended by the parties was the same as Crown's. Further, when Crown wrote the contracting officer in November 1988 complaining of the shortfall in the contract estimates, it specifically referred to the contract as a "requirement contract." The contracting officer never took issue with this characterization. In fact, characterization never surfaced as an issue until the government filed its cross-motion for summary judgment. The conduct and actions of the parties to the contract in this case during the entire course of the contract and thereafter is strong evidence that the parties viewed the contract as one for requirements. *See Cresswell v. United States*, 146 Ct.Cl. 119, 127, 173 F.Supp. 805, 811 (1959). *See also Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 73, 389 F.2d 424, 430 (1968) (practical interpretation of a contract, as shown by conduct of parties, is of great weight in interpreting the contract). As indicated above, "there is no surer way to find out what the parties meant, than to see what they have done."

5. The government argues that Crown is improperly seeking to introduce extrinsic evidence to steer the court's attention away from the "plain language" of the contract. Specifically, the government suggests that the November 3, 1988 letter cannot be examined to demonstrate the type of the contract between the parties because it represents a communication that took place after performance had started; likewise, Crown's suggestion that laundry service contracts such as these are normally for requirements should be of no import. One of the two defining questions in this case is whether this was an indefinite quantity contract or a requirements contract. The court finds that because the contract language could be interpreted to support either, the intentions of the parties must be examined to see what the contract really meant. "The parol evidence rule is therefore no bar to the use of the oral statements of the parties during negotiation, in aid of the inter-

Consider contract provision § H–15, which in pertinent part provides:

If, for any reason, the Contractor fails to perform any services covered by this contract, the Government may, if the Contracting Officer determines that the mission at Redstone Arsenal, Alabama, may be adversely impacted, perform or supplement performance of such contract services with the Government personnel or by separate contract with another contractor. Such performance shall not constitute a breach of contract by the Government.

This provision supports the view that this contract was for requirements. That this is . so is also indicated by the deposition testimony of Kilpatrick, Kerschner, and Mayes, each of whom remarked that the installation was turning to Crown to perform all services, and the affidavit of Crown's president, George A. Bellau, who testified that because both the government and contractors seek to lower costs as much as possible, "the custom and understanding in the industry is that a laundry service contractor awarded a Government laundry service contract will be obligated to service all of the laundry and dry cleaning from the specified units covered by the scope of work set forth in the contract." The court accepts the government's point that § H–15 above does not conclusively show this was a requirements contract, but Crown's reference to this clause certainly rises above mere "wishful thinking." Returning to the standards of interpretation outlined earlier in this order, if the court were to decide that this is an indefinite quantities contract, this section of the contract would be rendered meaningless. The contract terms, read together, are more

internally consistent if taken as expressions of a requirements contract instead of an indefinite quantities contract, and this determination the court can make as a matter of law. Finally, plaintiff fully performed the contract. The estimate shortfall was not of its doing. Finding the contract to be a requirements contract carries out the intent of the parties, better harmonizes the pertinent terms of the contract, and upholds rather than renders void the agreement of the parties.

Accordingly, with respect to characterizing the contract, plaintiff's cross-motion for summary judgment is granted and defendant's motion for summary judgment is denied.

### B. The Contract Estimates

It is settled that a bidder on a government contract is entitled to rely on government estimates set forth in the contract as representing honest and informed conclusions. *Womack v. United States,* 182 Ct.Cl. 399, 412, 389 F.2d 793, 801 (1968). Nevertheless, the mere fact that there is a significant variance between the estimates of work set forth in the contract and the actual work encountered in performance does not necessarily give rise to liability on the part of the government for the inaccurate estimates set forth in the contract. *Medart,* 967 F.2d at 581. Crown, as Kilpatrick well knew, had to rely on the estimates in the formulation of its bid and it did rely completely on the estimates set forth in the contract. Under these circumstances, the government was required to act in good faith and use reasonable care in computing its estimated needs. *Id.*

---

pretation of ambiguous or uncertain clauses in written agreements. Expressions of the parties during negotiations for the contract are thus a frequent source for interpretation of its text." *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972) (citations omitted). The parol evidence rule's principle of exclusion is not properly invoked when the court must make a legal judgment concerning the interpretation of ambiguous portion of a contract and the course of dealings and communications between the parties can illuminate their intentions. Further, the Federal Circuit

has recognized the principles of contract interpretation that "the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy," *Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1058 (Fed.Cir.1983), and that if the intent of the parties can be determined from words and other conduct, it is given considerable weight. *Alvin, Ltd. v. United States Postal Service,* 816 F.2d 1562, 1565 (Fed.Cir.1987). No dispute over the *character* of the contract arose in this case until *after* contract performance had been completed.

■ The government concedes that the estimates in the Crown contract were inaccurate. The shortfall in the estimates was approximately forty-five percent, *i.e.*, plaintiff received only fifty-five percent of the work estimated to be performed in the contract. Plaintiff felt that an estimate variance of from five to fifteen percent might be viewed as reasonable but felt a forty-five percent variance was unreasonable. The court agrees.

■ Crown contends that the inaccurate estimates set forth in the contract were the result of negligent action by government personnel in the formulation of the estimates or a lack of due care by government personnel in compiling the estimates. Where a contractor can show by preponderant evidence that estimates it relied on were negligently prepared or were unreasonably inadequate, indicating a lack of due care in their preparation at the time the estimates were made, the government may be liable for resulting damages. The government is not free to carelessly guess at its needs. *Medart*, 967 F.2d at 581. The fact that the actual work performed varies significantly from the inaccurate estimates set forth in the contract, however, does not shift the burden of persuasion to the government to prove the reasonableness of the estimating procedure. The plaintiff has the burden of persuasion to prove by a preponderance of the evidence that the inaccurate estimates were the result of negligent action by government personnel or a lack of due care by said personnel in the preparation of the estimates. *Id.*

■ The materials submitted to the court disclose that Redstone Arsenal formulated the estimates in question during the summer of 1987. The estimates were placed in the solicitation issued in June 1988. In formulating the estimates in 1987, Redstone Arsenal requested the using · activities to estimate their needs for laundry and dry cleaning services for use in the solicitation to be issued later on. The resulting estimates were submitted in a monthly format for a variety of laundry and dry cleaning services to the office of the contracting officer. A contract specialist in that office merely multiplied the monthly estimates by twelve, the months in a year, to arrive at the final yearly estimate figures set forth in the contract. These estimates were not otherwise verified or checked for reasonableness or accuracy.[6]

Crown contends that relying solely on the estimates of the needs of the using activities of the Redstone Arsenal was negligence and a manifestation of a lack of due care. In *Medart*, 967 F.2d at 581–82, the Federal Circuit had this to say regarding estimating procedures:

> Medart argues that taking last year's orders as next year's estimated needs is simply an unreasonable procedure. It contends that in determining reasonable estimates, GSA should have, among other things, contacted or polled end-users about their projected needs and budgets, considered the use of statistical formulas such as regression analysis, used more than one year's ordering history, and checked the effectiveness of its estimating procedure based on past perfor-

---

**6.** The deposition testimony indicates that no historical data were looked at or researched relative to these estimates. Mayes, the COR, felt they did not need any further information apart from what using activities stated were their estimated needs. Kilpatrick testified that he questioned some of the quantities estimated but could not remember if he directed Mayes to verify the accuracy of the information. Mayes testified that he did not verify the estimates.

Kerschner, the contract specialist in the office of the contracting officer, put the estimates portion of the contract together by multiplying the monthly estimates by twelve without verifying the monthly estimate figures she received. Inci-

dentally, the contracting officer's office was never able to ascertain the cause of the inaccurate estimates set forth in the contract. Mayes suggested a possible explanation:

A. Are you asking, do I think that they would exaggerate their [needs]—absolutely. To make sure they have quantity. We're placing [sic] a guessing game. These people say, "I may need 100 sheets, I may need 150 sheets next month." So if they may need 150 sheets, they put 150 on the [estimate list].
Q. So it would cause quite a hassle if they reached their limit and had to try to get it increased; would it not?
A. Absolutely.

mance. Each of these, and many other approaches, might have improved the accuracy of the government estimates, but their mere existence does not mean the approach selected was not reasonable.

In that case, an applicable regulation (48 CFR § 16.503(a)(1) (1991)) explicitly stated that estimates may be based on the most current information available.[7] Generally, if the government uses that information that is reasonably available, it need not search for or create additional information. *Id.* at 582.

As the Federal Circuit noted, the existence of a variety of approaches to estimate formulation does not mean that the approach selected by the government was not reasonable. In the case at bar, the government relied solely on the estimates of needs supplied by the user activities. It did not attempt to verify these estimates or buttress them with research or other data. Further, while the estimates were procured from the using activities in the summer of 1987, the government made no effort to update these estimates, *i.e.*, to request using activities to submit additional estimates based on their needs covering the period since the most recent estimates were submitted.

Crown argues that the government failed to utilize data readily available to it which may have exposed the inaccuracy of the using activities' estimates. The government suggests that these data were not readily available to the contracting officer's office but the totality of the materials before the court indicated that that information was available if that office wished to use it. These data consisted of the Holmes & Narver pickup and delivery tickets generated during the period from October 1, 1987 to September 30, 1988. At oral argument, government counsel seem to indicate that the tickets might have been useful to formulate the contract estimates. Kilpatrick testified that these tickets should have shown the amount of laundry processed by users. He did not say that he had reviewed their tickets at any time. These pickup and delivery tickets are not part of the materials before the court nor is there any analysis of these tickets before the court whereby one could plumb their probative value relative to the estimates issue. Further, there is no indication that these tickets would be available in any event should further proceedings be ordered for the purpose of ticket analysis. Relying on the tickets is only one approach; the existence of the tickets, even if they were available, does not necessarily mean that the approach selected by the government for estimate formulation was not reasonable under the totality of the circumstances. *Medart,* 967 F.2d at 581–82.[8]

Next, Crown stresses the time interval between the formulation of the estimate and the issuance of the solicitation containing the estimate, a period of about one year, to suggest negligence or lack of due care on the part of government personnel

---

7. It is uncertain if the regulation is applicable in this case. Plaintiff does argue that the estimates in issue did not reflect the most current information since the estimates from the user activities was obtained in the summer of 1987, yet the solicitation was not issued until June 1988, about a year later.

8. As noted below, though, the court finds that the government's approach to drawing up the estimates for the solicitation was not reasonable. The pickup and delivery tickets were generally available to the contracting officer's office at the time the solicitation was being prepared. There is little dispute that the information from the tickets would have indicated the quantity of services needed to be performed, which in turn could have been used to verify the estimates provided. That the tickets are not presently available for Crown to prove they would have been valuable cannot prevent Crown from asserting a lack of due care by the government. The record indicates that the contracting officer and the COR knew the estimates were being overstated, but no further investigation followed. In this circumstance, to penalize Crown for not producing tickets that were once in the hands of the government would be unfair. Indeed, Crown's attempt to obtain from the contracting officer Holmes & Narver contract data prior to entering into the contract were unsuccessful. At oral argument, defendant indicated that the Holmes & Narver tickets were lost, and thus Crown is deprived of any opportunity to establish that these tickets, available to defendant when the estimates at issue were inserted into the contract, would have provided vital information as to the accuracy of those estimates.

in failing to update the estimates. Whether updating would have produced more reasonably accurate estimates is questionable for the updating, if it occurred, most probably would have taken the form of again asking the using activities for their numbers, assuming the contracting officer would again refrain from examining the Holmes & Narver pickup tickets. On the basis of the materials at hand, the court is unable to determine whether updating the estimate shortly before the solicitation was issued would have produced more accurate estimates. It may well be there was no sure way to obtain more accurate predictions of estimates from using agencies. *See Medart,* 967 F.2d at 582.

Crown contends that the inaccurate estimates were the result of the unreasonableness and lack of due care on the part of government personnel in accepting the estimates of the needs of the using activities at face value without any verification or checks, noting that the COR was aware that the using activities most probably "exaggerated" their needs in order to ensure that any increase in those needs would be met by the future procurement. Further, Kilpatrick questioned some of the estimated quantities. The extent of his suspicions in this regard have not been explored in the materials at hand. He testified that he does not remember if he directed the Mayes to verify the accuracy of those questioned aspects of the estimates but the record clearly indicates no such verification was undertaken.

Finally, Crown argues that the government's conduct in formulating the estimates in the solicitation exhibited a lack of due care and a pattern of negligence that carried over into the solicitation for the contract to follow the completion of the Crown contract. When the solicitation for the new contract was issued, Crown was prepared to bid on the new contract. In viewing the work estimates set forth in the new solicitation, Crown saw the estimates as overstating the amount of work to be performed therein, based on its experience with the contract on which it had successfully bid. Failing to achieve any positive response from Redstone Arsenal personnel relative to the faulty estimates in the new solicitation, Crown filed a protest with the General Accounting Office. As a result, Redstone Arsenal thereafter modified the estimated quantity figures in the new solicitation to reflect the amount of work experienced by plaintiff in performing its contract. Crown cites this episode to indicate the lack of due care mentality on the part of Redstone Arsenal in formulating estimates for use in laundry and dry cleaning service contracts.

In *Womack v. United States,* 182 Ct.Cl. 399, 401, 389 F.2d 793, 801 (1968), the Court of Claims pointed out that the government was obligated to base solicitation estimates on "all relevant information that is reasonably available to it." If the critical element in this summary judgment matter is what relevant information was available to Redstone Arsenal procurement personnel relative to the estimate formulation utilized in the solicitation at issue in this case, then the case is not ripe for decision at this time. Indeed, the other areas where plaintiff is critical of the government's estimate formulation practice and procedure likewise needs to be ventilated at trial. On the other hand, if the issue is confined to the question of the reasonableness of the government's estimate formulation and attendant circumstances, then summary judgment is appropriate.

In *Medart,* the Federal Circuit indicated that while a number of approaches might have been utilized which might have improved the accuracy of the government's estimate, the mere existence of these approaches does not mean the approach selected by the government was not reasonable. In this case Redstone Arsenal relied on obtaining estimated needs from user activities. This is an approach sanctioned by *Medart,* 967 F.2d at 581. The estimates of needs of the using activities was information or data reasonably available to it. It was not necessary for Redstone Arsenal to search for or to create additional information unless it perceived the estimate information it did received from user activities was suspect or lacking.

In the case at bar, Redstone Arsenal contacted the using activities relative to their needs. This is a rather simple, direct, and rational approach. Obtaining estimates of those needs from the using activities is likewise a rational undertaking. The COR felt it unnecessary to search for or to create additional information since using activities are supposed to know their needs. If this were the end of the matter, it would be hard to criticize the government if subsequently, the estimates turned out to be higher than later events established they should have been. However, that is not this case.

The COR felt that the user activities "exaggerated" their estimates, increasing the estimates to protect themselves in case of increased needs which may or may not occur in the future. In effect, the using activities were carelessly guessing at their needs. The contracting officer, when confronted with the estimates from the user activities, questioned some of the quantities estimated and felt the matter should be checked out.[9] The estimates were not checked out or verified before the solicitation containing them was put out for bids. The failure of these two government officials to exercise reasonable care and take steps to check out and verify these questioned estimates provides a basis for awarding Crown damages in this case.

The facts underscoring recovery in this regard are undisputed. These facts are sufficient to support a finding of a lack of due care in formulating the estimates utilized in soliciting bids for the contract. It is conceded the estimates were inaccurate. The court holds that the estimates shortfall of forty-five percent was significant and damaging to Crown. Accordingly, Crown is entitled to recover because of these inaccurate estimates. The parties have agreed on the amount of damages Crown would be entitled to recover if Crown were to receive a favorable liability determination from the court.[10]

## C. Contract Modification Claim

Crown submitted a claim to Kilpatrick, the contracting officer on or about March 2, 1990 seeking to recover $122,944 as the damages it incurred because of the faulty work estimates set forth in the contract. Kilpatrick, in response to this claim, issued a unilateral contract modification, dated September 129, 1990, awarding Crown an equitable adjustment of $45,383.71 ($41,524.00 plus $3,859.71 in interest) pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 611, as compensation for the inaccurate estimates. This amount has been paid to Crown. The government has moved for summary judgment, asking the court to enter judgment in its favor in the amount of $45,383.71.[11]

The government asserts that the indefinite quantity contract executed by the parties lacked a minimum quantity clause and

9. The contracting officer testified that the accuracy of the estimates was critical to any bidder in this case because the bidder needed to know how much money it was going to receive so it could spread out its costs and expenses and anticipate a profit. Reasonably accurate estimates, he said, would give the government a fair bid price, enable the contractor to receive his costs and expenses, and make a reasonable profit. As indicated previously, the contracting officer unilaterally issued a contract modification in recognition of the fact that the estimates were inaccurate.

10. As Crown emphasized at oral argument, the damages the parties have stipulated to represents only that amount that would allow Crown to recover the costs it incurred in performing the contract; the stipulation does not allow Crown to realize a profit on the one-year contract.

11. The government has not pleaded a counterclaim in its answer. Crown, citing RCFC 13(a) (requiring that a compulsory counterclaim *shall* be stated at time answer is served (emphasis supplied)), contends that the government, since it did not file a counterclaim, should not at this late date be allowed any recovery attendant to the modification in question. Crown cites no case law in support of its position. The government states, in effect, that it is really not necessary for it to file a counterclaim but if it is necessary, the court has the power under RCFC 13(f) and RCFC 15 to permit amendments to the pleadings and thus should allow the government to amend its answer to assert a counterclaim. No request has been filed by the government to amend its answer in this regard.

thus rendered the contract illusory and unenforceable except to the extent performed. The government argues that because the modification is independent of and separate from the actual performance of the contract, the action by the contracting officer was beyond the pale of his contractual authority and thus the payment to Crown was erroneous and illegal.

█ Two immediate answers to the government's position surface. First, because the court finds that the contract was a requirements contract and not an indefinite quantity contract, the force of the government's position is dissipated. Second, the government errs when it tries to separate the contract modification from work actually performed. Defendant concedes that even if the contract is deemed to be an unenforceable contract, Crown is entitled to recover to the degree the contract was actually performed. The contracting officer recognized that the work estimate provided the basis for the bid price submitted to the government. The larger the number of work items listed in the work estimates, the lower the cost allocation per item of work performed. The lower the number of work items listed in the work estimates, the higher the cost allocation per item of work performed. When actual work performance produced a lower number of items, the cost allocation per work item was higher than was the bid price which was based on a higher number of work items and an attendant lower cost allocation per item of work. Crown is entitled to be paid the reasonable value of the work performed. Generally, the value of the work is measured by the contract price. *See Ralph Constr., Inc.*, 4 Cl.Ct. at 733. But here the contract price per work item was skewed by the inaccurate estimates and thus the reasonable value of the work was distorted. In the contract modification, the contracting officer undoubtedly sought to arrive at a reasonable value of the work performed by increasing the contract price by the modification to lower the allocation per item of work. In doing this, the contracting officer was only paying plaintiff that amount necessary to achieve the reasonable value of the work actually performed.

█ In any event, another reason precludes granting defendant's motion for summary judgment relative to the contract modifications in question. Payment to Crown under the contract modification was not a government claim. The payment was made under the Contract Disputes Act. The government now seeks to recover that payment on the ground that the payment was erroneously made. It would appear that a contracting officer's decision asserting the government's right to recover the "erroneous" modification payment is a prerequisite to such a suit in this court. 41 U.S.C. § 605(a); *see also Joseph Morton Co., Inc. v. United States*, 757 F.2d 1273, 1276, 1279–81 (Fed.Cir.1985) *aff'g* 3 Cl.Ct. 780, 783 (1983). Accordingly, because there has been no contracting officer's decision on the government's claim to recover the $45,383.71 paid to Crown under the contract modification, the court is without jurisdiction to consider the same. *Id.* Defendant's motion for summary judgment on the contract modification payment is denied.

## CONCLUSION

Based on the above discussion, plaintiff's cross-motion for summary judgment is granted and defendant's motion for summary judgment is denied. Plaintiff is entitled to recover $58,286.29 plus interest thereon, under the Contract Disputes Act, 41 U.S.C. § 611, from March 7, 1990 until payment thereof. Accordingly, the clerk is directed to enter judgment in favor of plaintiff as set forth above. No costs.